**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZIP AVIATION, LLC, | CASE NO. _____ |
| Plaintiff, | |
| -against- | **COMPLAINT** |
| ROBINSON AVIATION (RVA), INC. and TOWN OF EAST HAMPTON, | **Jury Trial Demanded** |
| Defendants. | |

Plaintiff Zip Aviation, LLC ("Zip Aviation," "Zip" or "Plaintiff"), by its undersigned attorneys, as and for its complaint against defendants Robinson Aviation (RVA), Inc. ("Robinson") and the Town of East Hampton (the "Town" or "East Hampton") (together, "Defendants"), hereby alleges as follows:

**Introduction**

1. This case concerns an improper and illegal attempt by the Town and its contracted airport operator, Robinson, to severely restrict access to the East Hampton Airport ("HTO," which is the International Air Transportation Association code for the airport). By this action, Zip Aviation seeks declaratory and injunctive relief preventing the Town and Robinson from continuing to implement a new policy (the "Policy"), one that runs counter to FAA regulations, pursuant to which HTO will refuse to grant any "Special Visual Flight Rules" ("SVFR") clearances (explained below) for takeoffs and landings.

2. HTO is a public-use airport that the Federal Aviation Administration ("FAA") has designated as important to the United States national air transportation system—one of only 3,400 (out of approximately 19,000) airports so designated. Since its construction in the 1930s,

HTO has been open to commercial and recreational aircraft of all kinds. While the Town owns HTO and operates it through Robinson, the airport is subject to federal aviation law and policy. In the field of aviation, Congress has occupied the field and preempted state and local law, and the Town does not have authority to impose restrictions on HTO's use that are inconsistent with federal law or policy.

3. The Town has portrayed its "No SVFR" Policy as a safety concern, but that is merely a pretense. Airports throughout the United States—including a hundred airports that Robinson itself manages—routinely receive and grant SVFR clearances, and FAA regulations and/or orders specifically contemplate them. Instead, this new Policy is nothing more than the latest attempt by the Town, dissatisfied with the protections afforded by federal law and regulations, to control aircraft noise, this time by either forcing aircraft into predetermined flight paths of the Town's choosing or discouraging them from using HTO altogether.

4. The Policy has the practical effect of barring most helicopters from taking off from or landing at HTO at all. Nearly all single-engine helicopters like those that comprise Zip's fleet cannot be certified for navigation under Instrument Flight Rules ("IFR"). As a result, these aircraft can never use HTO if localized weather conditions cause HTO to switch to IFR protocols, which HTO frequently does, even in otherwise good weather and even when it is completely safe for a helicopter to use Visual Flight Rules. Thus, Zip can never guarantee its passengers a landing at HTO, and those passengers will not book flights with Zip to reach HTO, Eastern Long Island's busiest airport for helicopter traffic and Zip's number one destination.

5. Without declaratory and injunctive relief, Zip faces the loss of nearly two-thirds of its business. Zip's customer relationships, reputation, and good will have all suffered severe

harm, and will suffer additional harm unless Defendants are enjoined from imposing their improper policy on airport users.

## The Parties

6. Plaintiff Zip Aviation is a limited liability company organized under the laws of the State of New York, with its principal office located at 6 East River Piers, New York, New York. Zip owns and operates a fleet of single-engine helicopters, and offers both aerial tours of New York City and charter services from the City to other airports in the Northeast, both within and without New York.

7. Defendant Town of East Hampton is a town located in Suffolk County, on the east end of Long Island, consisting of the village East Hampton, the hamlets of Amagansett Montauk, Springs, and Wainscott, and part of the incorporated village of Sag Harbor.

8. Upon information and belief, defendant Robinson Aviation (RVA), Inc. is a corporation organized under the laws of the Commonwealth of Virginia, with its principal place of business located in Oklahoma City, Oklahoma. Upon information and belief, Robinson manages HTO on behalf of the town pursuant to a contract with the Town.

## Jurisdiction and Venue

9. This Court has "federal question" jurisdiction over Zip's claims pursuant to 28 U.S.C. § 1331. Zip's claims arise under the Supremacy and Commerce Clauses of the United States Constitution, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the equitable powers of this Court.

10. Venue is proper in this District under 28 U.S.C. § 1391(b), because the Town is located in this District and the events giving rise to Zip's claims occurred in this District.

**Facts**

*HTO is an Important Regional Airport Involved in Interstate Commerce*

11.     East Hampton Airport (HTO) was built in 1936 with federal funds from the Works Progress Administration.  Since the airport opened in 1938, it has been open to the public and has served aviators and aircraft operators of all sorts, including commercial and recreational flight. Chartered flight services have been continuously provided at the Airport for decades.

12.     HTO is important to people and businesses on Long Island and elsewhere. It is an engine for regional and local commerce. The Airport connects the East End of Long Island to New York City and destinations up and down the East Coast, around the United States, and internationally. HTO's operation has helped make Long Island's East End an accessible, desirable destination, especially during the summer. HTO's users include many East Hampton and East End business owners and homeowners for whom the Airport was an important feature in deciding where to locate their business or purchase their home. HTO is also a base for flight instruction and training, and serves medical, law enforcement, and search and rescue operations.

13.     The FAA has identified HTO as "important to national air transportation" and included HTO in its 2015-2019 National Plan of Integrated Airport Systems ("NPIAS"), a report the FAA provides to Congress. *See* FAA Report to Congress: National Plan of Integrated Airport Systems (NPIAS) 2015-2019, http://www.faa.gov/airports/planning_capacity/npias/reports/. HTO is one of only about 3,300 airports to be included in the NPIAS report, out of approximate 19,000 nationwide airports.  The FAA has also classified East Hampton Airport as a "regional" general aviation airport, recognizing that the Airport supports interstate commerce. *See* FAA, General Aviation Airports: A National Asset, 12 (May 2012), available at

http://www.faa.gov/airports/planning_capacity/ga_study/media/2012Asset Report.pdf.  HTO has long been the busiest airport for helicopter traffic on the East End.

*Zip Aviation is an Air Carrier with a Long History of Flights to HTO*

14.     Itai Shoshani founded Plaintiff Zip Aviation in 2004.  The company started as a single helicopter offering aerial tours of New York City.  In the almost 18 years that followed, the company's fleet has grown to eight helicopters. In addition to aerial tours of the City, for many years Zip has been offering private charter services from New York City's Heliports and the heliport in Fairfield, New Jersey to airports around the entire Northeast United States, including (without limitation) Atlantic City, New Jersey and Philadelphia, Pennsylvania.

15.     Zip Aviation has an excellent safety record.  The company employs the most experienced pilot crew and operates highly-maintained aircraft. Its professional aviators are highly trained with thousands of hours in helicopters, and are certified by the Federal Aviation Administration (FAA).  In addition, Zip's aircraft are equipped with traffic warning systems, low-terrain warning systems, GPS navigation, life jackets, and Airframe flotation devices.

16.     One of Zip's most popular charter destinations out of New York has long been Eastern Long Island and the Hamptons, including HTO.  Thanks to the versatility of helicopters, what could otherwise be a three- to four-hour trip by car or train to reach the popular East End summer destination can be reduced to under an hour of flight time and usually under two hours, door-to-door.

17.     In the summertime, Zip generally flies an average of 5-6 flights to or from HTO per day.  On weekends, Zip sometimes flies as many as 15-20 flights per day.  Over the past five years, Zip Aviation has made over 1000 flights to/from HTO.

*East Hampton's Attempts to Regulate Aircraft Noise in*
*Violation of FAA Rules*

18. For several years, East Hampton has been attempting to find ways to reduce aircraft noise. For example, in 2015 the Town attempted to enact local laws that imposed an 8:00 pm to 7:00 am curfew on most aircraft utilizing HTO (not including Zip's noise-compliant helicopters), an extended curfew on particularly "noisy" aircraft lasting until 9:00 am, and a limit of two operations per week on such aircraft's use of HTO. A group of aviation companies sued the Town, resulting in an injunction prohibiting the Town from enforcing these local laws, which were inconsistent with FAA regulations. *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 136 (2d Cir. 2016).

19. Having failed to achieve its goals by attempting to directly regulate takeoffs and landings with reference to noise, the Town sought other ways to achieve those ends. For example, a few years ago Robinson and HTO began threatening aviators using the airport that if their aircraft did not follow certain "voluntary" routes in their approaches into HTO—routes that are not even within HTO's airspace and thus are not subject to HTO's control—they would deny SVFR landing clearance (explained below), which they should otherwise have properly granted. Although Defendants' demands were clearly improper under federal regulations, Zip nonetheless complied with their demands.

20. Defendants' attempt to force all flights into certain predetermined (less noisy) flight paths apparently did not sufficiently achieve its desired outcome. Therefore, earlier this year, the Town came up with a new idea: refusing outright to grant SVFR clearances to otherwise qualified aircraft.

*Pilots Rely on Several Types of Flight Rules, Necessary for Safe Operations*

21. All aircraft flying within the United States' airspace system operate under one of two sets of rules while in flight and while taking off and landing. The first set of rules is Visual Flight Rules (VFR). Under VFR, the pilot operates the aircraft by visual reference to the ground, and by visually avoiding obstructions and other aircraft. VFR is the most common mode of operation for small aircraft, including helicopters.

22. VFR is permitted when cloud coverage and visibility meet VFR criteria. When flying through or above clouds, or in fog, rain, dust, the ground is not always visible. Under FAA rules, the minimum weather conditions necessary for ceiling and visibility for VFR flights vary depending on the type of airspace in which the aircraft is operating, and on whether the flight is a daytime or nighttime flight. Typical daytime VFR minimums for most airspace, however, is three miles of flight visibility and a distance from clouds of 500 feet below, 1,000 feet above, and 2,000 feet horizontally. Flight conditions equal to or greater than these minimums are known as visual meteorological conditions (VMC).

23. The second set of rules pilots use is known as Instrument Flight Rules (IFR). IFR govern flight under conditions in which VMC are not present and flight by outside visual reference may not be safe. During IFR flight, the pilot relies on the aircraft's instruments and instruments on the airport's surface, and navigates by reference to electronic signals. As a result, when flying by IFR all aircraft follow specific, predetermined flight paths into the airport, an approach laid out for them electronically.

24. While FAA regulations require all aircraft to have certain instruments on board, including some of those that are needed for IFR flight, not all aircraft are fully equipped for IFR flight, and most single-engine helicopters cannot be certified for IFR flight. This does not mean,

however, that these aircraft need to be grounded during less-than-perfect weather conditions. Even under certain circumstances when VMC are not present, FAA regulations allow a pilot to request from an airport traffic controller "Special VFR" (SVFR) clearance for takeoffs and landings.

25. SVFR clearance permits a pilot to use VFR under conditions that practically allow for safe navigation but technically require IFR. Pilots request—and control towers routinely grant—SVFR clearance when they determine that the pilot can safely take off, navigate, and/or land despite the absence of VMC. For example, the cloud ceiling or horizontal visibility at a given airport might be just below the required minimums for VFR, but the pilot may nonetheless be able to determine that his or her path to the airport has clear visibility and that he or she can safely land using visual navigation.

26. FAA orders lay out the factors a control tower must consider in deciding whether to grant or deny SVFR clearance. Air traffic control towers are supposed to consider these requests on a case-by-case basis. *See, e.g.,* FAA Order JO 7110.65T, § 5, (available at https://tfmlearning.faa.gov/publications/atpubs/ATC/atc0705.html).

27. SVFR is particularly useful, appropriate, and important for helicopters because unlike a plane, a helicopter has the ability to fly as low and as slow as the pilot wishes—even stopping and hovering in one place—as long as he or she can see the ground.

28. SVFR are most frequently used in situations involving localized weather conditions at or near an airport. Such localized conditions are very common at the small airports on Eastern Long Island, which are located in low-lying, largely flat areas very close to the ocean. On days when the weather at the nearby beaches is sunny and beautiful, the areas surrounding the East End's airports can still trap patches of sea fog rising off the ocean.

29. Federal regulations explicitly permit SVFR operations at any location not prohibited by those regulations otherwise exempt from them. *See* 14 CFR § 91.157.

30. FAA regulations do not prohibit SVFR operations at HTO. *See* 14 CFR Part 91, Appendix D. HTO has also not sought or been granted an exemption from 14 CFR Part 91 from the FAA.

31. Upon information and belief, HTO did enter into a Letter of Agreement (LOA) effective as of May 3, 2021 with the New York Terminal Radar Approach Control (TRACON) Facilities, which is responsible for the safe, orderly, and expeditious flow of arrival, departure, and en-route air traffic. Upon information and belief, however, while that LOA defines air traffic control procedures and coordination responsibilities between New York TRACON and HTO, it does not grant HTO any regulatory authority to promulgate safety policy, and certainly does not allow HTO to formulate policies that are contrary to FAA regulations.

*HTO Has Improperly Denied Zip and Other Aviation Companies the Ability to Fly into HTO Using SVFR*

32. The policy of HTO's control tower, which Robinson operates, is to switch to IFR-only takeoffs and landings when the cloud ceiling is below 1000 feet or there is less than three miles of visibility. When those conditions are present, the airport turns on its signal beacon and pilots must get clearance from the air traffic control tower to land using IFR or—at least in the past—SVFR. In the summer near the ocean, there is almost always low cloud cover, meaning that HTO has almost always operated under IFR and/or by granting SVFR clearances to aircraft.

33. Zip Aviation routinely takes off from and lands at the airports on Eastern Long Island and elsewhere in the New York region using SVFR under weather conditions not meeting VMC minimums. In fact, Zip Aviation (along with many other aviation companies) has successfully used SVFR to take off and land at HTO itself for many years, without incident.

While all of Zip's pilots are instrument-rated, Zip's helicopter fleet is not equipped with all of the instruments necessary for IFR flights, and Zip has never needed them to service its clientele. Indeed, the minimum weather conditions for IFR are well above those under which FAA rules allow for SVFR, and Zip flies into all other airports with SVFR clearance under conditions sometimes below those required for IFR that are nonetheless authorized and completely safe.

34. In March 2021, HTO suddenly announced that it would no longer grant *any* SVFR clearances for Class D flight operations. Class D airspace includes airspace within 2500 feet above an airport's elevation in the area surrounding an airport with an operational control tower. Effectively, the newly announced Policy meant that there would be no more SVFR takeoffs or landings from HTO.

35. On April 27, 2021 HTO issued an operating procedures memo again announcing that, as a blanket rule, "Special VFR clearances will not be provided at HTO during Class D operations." Two days later, on April 29, 2021, HTO's Director, James Brundige, issued a memo to all helicopter operators, enclosing HTO's arrival and departure routes. Once again, the memo stated that "Special VFR clearances will not be provided at HTO during Class D operations."

36. On May 31, 2021 one of Zip's charter flights began approaching HTO. Although the weather that day was not particularly bad, localized conditions fell below HTO's minimum requirements for VFR, and HTO implemented its IFR protocols. Lacking sufficient instrumentation for IFR flight, Zip's pilot requested SVFR clearance for landing. The control tower denied clearance. This has happened on numerous occasions since that time.

*The FAA Has Opined that HTO's Policy Is Contrary to Federal Law and Regulations*

37. Zip and others in the aviation industry were unhappy with the "No SVFR" Policy that the Town has implemented and that Robinson is enforcing. Upon information and belief, one or more industry organizations contacted the FAA and brought the new Town Policy to the FAA's attention. The result was a series of communications between the FAA and the Town about the Policy.

38. Upon information and belief, on or about April 26, 2021 HTO Airport Director James Brundige sent a memo concerning the Town's new Policy to Troy Sica, the FAA's Plans and Procedures Specialist at the New York TRACON. Upon information and belief, that memo purported to cite safety concerns as the basis for the Town's new Policy.

39. Upon information and belief, on May 24, 2021, Mr. Brundige wrote a letter to Marie Kennington Gardiner, Acting Regional Administrator for the FAA's Eastern Region, again defending the Policy and citing putative safety concerns as the basis for the Policy.

40. Upon information and belief, however, the Town's decision to deny all requests for SVFR clearance has nothing to do with any safety concern. Rather, it is another attempt by the Town to severely restrict helicopter traffic to HTO, in order to reduce unwanted noise that the Town has not been able to curb otherwise. Indeed, upon information and belief, Robinson operates 100 airports, and their controllers routinely authorize SVFR clearance.

41. On June 30, 2021, Ms. Gardiner replied to Mr. Brundige. In her response letter, Ms. Gardiner explained to Mr. Brundige that the Town's "No SVFR" Policy is inconsistent with FAA regulations and federal law. Ms. Gardiner also pointed out that under the FAA regulation, SVFR clearance requests are supposed to be evaluated on a case-by-case basis with reference to factors enumerated by the FAA. Ms. Gardiner's letter warned Mr. Brundige that HTO "lacks the

11

authority to deny all requests for special VFR clearances," and that HTO is not a regulatory agency that can promulgate safety policy. As to Mr. Brundige's purported safety concerns, Ms. Gardiner noted that the FAA has reviewed the reports of certain accidents Mr. Brundige had cited in support of HTO's new Policy, and found that those incidents were irrelevant to SVFR clearance and "not germane to this issue."

42. In sum, Ms. Gardiner warned Mr. Brundige that "to the extent that you are continuing to ban all special VFR clearances at HTO during Class D operations, you should remain aware that your decision is neither consistent with FAA policy nor Federal law."

43. Despite Ms. Gardiner's June 30, 2021 letter, Robinson's air traffic controllers at the HTO tower have continued to enforce the Town's "No SVFR" Policy, refusing to grant clearances for Zip's pilots to take off from or land at HTO using SVFR.

*The "No SVFR" Policy Violates and Conflicts with Federal Law and Policy*

44. The Town's "No SVFR" Policy violates and conflicts with federal statutes, regulations, and policy.

45. Congress passed the Federal Aviation Act, 49 U.S.C. § 1301 *et seq.*, "for the purpose of centralizing in a single authority the power to frame rules for the safe and efficient use of the nation's airspace… ." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 74 (2d Cir. 2019). The Act preempts the entire field of air safety. *Id.*

46. In addition, 49 U.S.C. § 41713 provides, in pertinent part, as follows:

> **(b) Preemption.**
>
> (1) Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

Under 49 U.S.C. § 40102(a)(2), "air carrier" means a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation.

47. Zip is an "air carrier" under the Federal Aviation Act. The Town's "No SVFR" Policy functions as a provision having the force and effect of a law related to the route or service of an air carrier. The Policy therefore runs afoul of § 41713 of the Act.

48. Additionally, FAA regulations, such as 14 CFR § 91.157, specifically contemplate the availability of special VFR clearances and operations, and permit them at any location not prohibited by the regulations or otherwise exempted from them. FAA policy, as reflected in FAA orders such as FAA JO Order JO 7110.65T, contemplate the issuance of SVFR clearance on a case-by-case basis, and prescribe the considerations airport control towers should consult in reviewing SVFR clearance requests and granting or denying those requests.

49. The Town has no authority to regulate flight altitude, flight paths, operational bans, or any regulation of the navigable airspace surrounding HTO. By banning SVFR clearances, Defendants are encroaching on the FAA's exclusive authority to fulfill its safety and airspace oversight responsibilities.

50. Moreover, the Airport Noise and Capacity Act of 1990, 49 U.S.C. § 47521 *et seq*. ("ANCA"), and the implementing regulations thereto, 14 CFR Part 161, require compliance with specific notice and/or approval procedures before imposing any access restrictions on certain aircraft at a public use airport.

51. The "No SVFR" Policy amounts to an access restriction at HTO. The Town did not comply with the notice or approval requirements of ANCA or the related FAA regulations before implementing its "No SVFR" Policy.

52. The Policy is unreasonable because it interferes with federal law and policies controlling the safe and efficient use of navigable airspace. The Policy will disrupt the national system of civil aviation, and cause operational difficulties at other local and regional airports, including congestion, and potentially dangerous situations.

53. The Policy is also unreasonable because it creates an unwarranted burden on interstate commerce. If each locality in the nation was allowed to set different requirements and standards for aircraft operating within its limits, there would be substantial negative effect on commerce.

*The Town's Policy, and Robinson's Enforcement of that Policy, is Causing Severe, Irreparable Harm to Zip Aviation*

54. The Town's decision to ban all SVFR clearance, and Robinson's resolve to enforce that Policy, have had a devastating effect on Zip Aviation's business. This has caused Zip irreparable harm and continues to pose a threat of imminent irreparable harm on a daily basis.

55. As noted above, Zip's helicopter fleet is not equipped for IFR flight, and its helicopters are not—and cannot become—IFR certified. With HTO denying all requests for SVFR clearance, Zip can therefore effectively no longer fly to HTO. Even on apparently clear days, the risk of localized conditions developing at HTO mid-flight means that Zip cannot ever guarantee its passengers a landing at HTO.

56. Given the nature of Zip's business, Zip services a very demanding clientele. Many of Zip's passengers desiring to travel to East Hampton will not accept an unplanned landing at another nearby airport, which will require additional travel by car to reach East Hampton. Faced with the risk that they may depart New York City and land anywhere other than East Hampton, Zip's clients will decline to travel with Zip at all. In these cases, Zip loses

not one but *two* flights, because a customer who opts not to take the first flight out to East Hampton and instead travels by car will not be chartering a flight back to New York when their stay in East Hampton ends, because the customer must return to New York City with his or her car.

57. As noted above, Zip has already had flights denied access to HTO due to localized weather issues under which Zip could have safely landed using SVFR. In addition to the May 31, 2021 incident noted above, for example, on July 4, 2021 a Zip charter flight left New York City's 30th St. Heliport carrying six passengers en route to HTO. As the pilot approached HTO, localized weather conditions caused HTO to implement IFR protocols. Zip's pilot was denied SVFR landing clearance, and was forced to divert to the Southampton Heliport and land there under nearly identical weather conditions. The Southampton Heliport is approximately 45 minutes from East Hampton Airport by car, causing significant inconvenience and nearly doubling the transit time for Zip's clients, thus depriving them of the primary benefit for which they agreed to pay thousands of dollars: a quick and easy trip. These clients indicated that they will likely never fly with Zip to East Hampton again. This is only one more example of a situation that has occurred on numerous occasions.

58. As of July 13, 2021, Zip has lost approximately 250 flights due to HTO's new policy, thanks to customers who have cancelled flights or declined to book with Zip altogether. The amount of revenue Zip realizes from each flight varies, but is between roughly $3,000 and $6,000 per flight. Thus, lost flights have already cost Zip between $750,000 and $1,500,000. This already substantial loss of business continues to mount. Moreover, flights to HTO comprise approximately 65% of Zip's business, so that the loss of Zip's ability to fly to HTO has cost Zip nearly two-thirds of its business during these times.

59. In addition to this number, Zip has suffered additional monetary losses thanks to aircraft that have been grounded at HTO unnecessarily due to HTO's refusal to grant SVFR clearance for takeoffs. These aircraft were unavailable during these periods to fly other routes for Zip, depriving Zip of the revenue it would have realized from those flights. Moreover, Zip was forced to pay overtime to pilots who were grounded at HTO, waiting for conditions to change.

60. It is not present revenue losses alone, however, that are causing the most harm to Zip. It is the irreversible damage being inflicted upon Zip's reputation, the devastating effect on Zip's customer relationships, and the obliteration of the good will Zip has spent so many years building that pose the most concern to Zip. These are injuries that cannot be measured in mere dollars and cents, and cannot be reversed.

61. When a Zip customer learns that Zip cannot guarantee arrival in East Hampton, Zip is seen as an unreliable option for travel. That customer instead goes and books another service, such as a sea plane, that has instruments allowing it to utilize IFR. Worse, as noted, Zip has had passengers en route to East Hampton when the weather has changed to require IFR under HTO's policies, and Zip has had to transport those passengers to another airport (which grants SVFR clearances under the same conditions). These customers will no longer fly with Zip anymore. If there is a cloud anywhere in the sky—and often even when there isn't—these passengers will simply never book with Zip again.

62. The Town's policy is decimating Zip's business, and an award of monetary damages at some later date could never compensate for Zip's complete loss of all business to HTO. In addition, a monetary award cannot make Zip whole for an unknown and unknowable amount of charters to other East End destinations lost as Zip's former East Hampton clients

spread the word about their negative experience or their decision to find other means of transportation.

63. Unable to fly to HTO, Zip will lose market share to other aviation companies and transportation options that Zip may never recover. As noted, customers who determine that we cannot fly to HTO have booked other means of reaching HTO and East Hampton, including sea planes with instruments sufficient to allow them to use IFR

64. Because HTO has long been one of Zip's major summertime destinations, if Zip can no longer fly to HTO, Zip may be forced to downsize its fleet of aircraft, and correspondingly reduce its roster of pilots and other staff. This would mean the loss of highly trained personnel that comprise a top-level staff whose quality Zip might never be able to restore. This would be a major business disruption that could never be cured by monetary damages at the end of this litigation.

## COUNT I
## DECLARATORY RELIEF
### (Supremacy Clause, U.S. Const., art. VI)

65. Plaintiffs repeat and reallege the allegations of all of the foregoing paragraphs of this Complaint as if more fully set forth herein.

66. Under Article VI the United States Constitution, the "Constitution, and the laws of the United States which shall be made in pursuance thereof… shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

67. As a result of the Supremacy Clause, local laws that interfere with or are contrary to federal law are invalid and unenforceable.

68. The "No SVFR" Policy is contrary to and interferes with federal law, including (without limitation) the Federal Aviation Act, the Airport Noise and Capacity Act, and the FAA regulations implementing those statutes.

69. The "No SVFR" Policy is contrary to and interferes with federal aviation policy as expressed by Congress and the FAA.

70. The Policy relates to the "route, or service of an air carrier," including (without limitation) Plaintiff Zip Aviation, and is thus expressly preempted by 49 U.S.C. § 41713(b)(1). The Policy is not subject to the "proprietor's exception" under 49 U.S.C. § 41713(b)(3), because the Policy is unreasonable, arbitrary and/or discriminatory.

71. The Town purposefully adopted the Policy in violation of federal law.

72. The Policy is preempted by federal law, and violates the Supremacy Clause.

73. The Policy is causing irreparable harm to Zip Aviation, by inflicting severe economic losses, damages to reputation, loss of good will, and loss of customer relationships.

74. An actual controversy exists between Zip and Defendants, and this Court can declare the rights and legal relations between Zip and Defendants.

## COUNT II
## DECLARATORY RELIEF
## (Commerce Clause, U.S. Const., art. I)

75. Plaintiffs repeat and reallege the allegations of all of the foregoing paragraphs of this Complaint as if more fully set forth herein.

76. Under Article I, Clause 3 of the U.S. Constitution, "Congress shall have Power… [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

77. The Commerce Clause limits the power of local governments to erect barriers against interstate trade.

78. East Hampton is a travel destination for people all over the United States. It serves as a gateway to the East End of Long Island, bringing travelers from around the nation.

79. Zip is an aviation company engaged in the interstate transportation of passengers, including between HTO and points inside and outside of New York State.

80. The "No SVFR" Policy renders air travel between East Hampton and points outside New York unavailable and impractical.

81. The Policy will cause neighboring airports to become congested and exceed their capacity during the busiest season of the year, further hampering access to East Hampton by interstate air travel.

82. The Policy, in practice and in purpose, discriminates against and excludes many types of interstate air travel to and from East Hampton, including interstate air travel in which Zip has engaged and seeks to continue to engage.

83. The Policy, in practice and in purpose, blocks the flow of interstate commerce and interferes with the freedom of travel and movement of persons between states.

84. The Policy violates the Commerce Clause.

85. The Policy is causing irreparable harm to Zip Aviation, by inflicting severe economic losses, damages to reputation, loss of good will, and loss of customer relationships.

86. An actual controversy exists between Zip and Defendants, and this Court can declare the rights and legal relations between Zip and Defendants.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Zip Aviation, LLC respectfully requests that the Court grant judgment in Zip's favor and against defendants Robinson Aviation (RVA), Inc. and Town of East Hampton:

(a) Declaring that the "No SVFR" Policy is preempted by federal law, invalid, and unenforceable; and

(b) Enjoining Defendants and their agents from enforcing the Policy in accordance with the above declarations; and

(c) Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
July 22, 2021

                            DAVIS+GILBERT LLP

                            By: */s/ Joshua H. Epstein*
                                  Joshua H. Epstein
                                  David S. Greenberg
                            1675 Broadway
                            New York, New York 10019
                            (212) 468-4800
                            jepstein@dglaw.com
                            dgreenberg@dglaw.com

                            *Counsel for Plaintiff Zip Aviation, LLC*