**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZIP AVIATION, LLC,<br><br>     Plaintiff,<br><br>    -against-<br><br>ROBINSON AVIATION (RVA), INC. and<br>TOWN OF EAST HAMPTON,<br><br>     Defendants. | CASE NO. 2:21-cv-04111 |

<u>**DECLARATION OF ITAI SHOSHANI**</u>

   ITAI SHOSHANI declares under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

   1.  I am the founder of Zip Aviation, LLC, the plaintiff in the above-captioned action. I make this declaration in support of Zip Aviation's application for a temporary restraining order and preliminary injunction barring defendants, Robinson Aviation (RVA), Inc. ("Robinson") and the Town of East Hampton (the "Town" or "East Hampton") (together, "Defendants") from enforcing a policy of denying all helicopter flights into and out of East Hampton Airport ("HTO," which is the International Air Transportation Association code for the airport) clearance to take off and land using "Special Visual Flight Rules" ("SVFR"). I am fully familiar with the facts set forth in this declaration.

<u>**Background: Zip Aviation**</u>

   2.  I have a lifelong aviation passion.  I had my first experiences with flight and aviation as an air force cadet in 1980.  I came from Israel to the United States as a photography student.

3.      As a student, to pay for my schooling, I began working at John F. Kennedy International Airport as a member of their security team.  My position at JFK was to identify passengers potentially posing a threat.

4.      I have been piloting helicopters since the mid-1990s, when I learned to fly a helicopter and volunteered for the Hurricane Andrew relief effort.  Since that time, I have flown hundreds of helicopter flights and logged thousands of hours in the cockpit, both as part of my vocation and also as responsible citizen, trying to give back on a wide range of missions, from hurricane relief to organ donation flights, to medical supply deliveries, to food deliveries in devastated areas for organizations such as World Central Kitchen.

5.      In 2004 I founded Plaintiff Zip Aviation.  Zip Aviation started as a single helicopter offering aerial tours of New York City.  My vision at the time was to give customers a VIP experience of flight, regardless of whether they are celebrities or influential business executives.  In the almost 18 years since I founded the company, our fleet has grown to eight helicopters. In addition to aerial tours of New York City, for many years we have been offering private charter services from New York City's Heliports and the Fairfield, New Jersey heliport to airports around the entire Northeast United States, including (without limitation) Atlantic City, New Jersey and Philadelphia, Pennsylvania.

6.      Zip Aviation has an excellent safety record.  Passenger safety is our main priority, so we employ the most experienced pilot crew and operate highly-maintained aircraft. Our professional aviators are highly trained with thousands of hours in helicopters, and are certified by the Federal Aviation Administration (FAA).  In addition, our aircraft are equipped with traffic warning systems, low-terrain warning systems, GPS navigation, life jackets, and Airframe flotation devices.

**Zip Aviation Has a Long History of Successful Flights to HTO**

7.      One of Zip's most popular charter destinations out of New York has long been Eastern Long Island and the Hamptons, including HTO.  Thanks to the versatility of our helicopters, what could otherwise be a three- to four-hour trip by car or train to reach the popular East End summer destination can be reduced to under an hour of flight time and usually under two hours, door-to-door.

8.      HTO has long been the busiest airport for helicopter traffic on the East End.  The Federal Aviation Administration ("FAA") has designated HTO as a "regional" facility in its National Plan of Integrated Airport Systems (NPIAS), only one step below the top-level "national" category of non-primary airports.  (Attached as Exhibit 1 is a true and correct copy of the FAA's 2021-2025 NPIAS, including Appendix A thereto, listing HTO as a regional airport at page A-72.)

9.      In the summertime, Zip generally flies an average of 5-6 flights to or from HTO per day.  On weekends, Zip sometimes flies as many as 15-20 flights per day.   Over the past five years, Zip Aviation has made over 1000 flights to/from HTO.  Recent actions by the Town of East Hampton, however, have all but eliminated our ability to continue making these flights.

**East Hampton's Attempts to Regulate Aircraft Noise in
Violation of FAA Rules**

10.      For several years, East Hampton has been attempting to find ways to reduce aircraft noise.  For example, in 2015 the Town attempted to enact local laws that imposed am 8:00 pm to 7:00 am curfew on most aircraft utilizing HTO (not including Zip's noise-compliant helicopters), an extended curfew on particularly "noisy" aircraft lasting until 9:00 am, and a limit of two operations per week on such aircraft's use of HTO. A group of aviation companies sued the Town, resulting in an injunction prohibiting the Town from enforcing these local laws, which

were inconsistent with FAA regulations.  *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 136 (2d Cir. 2016).

11.     Having failed to achieve its goals by attempting to directly regulate takeoffs and landings with reference to noise, the Town sought other ways to achieve those ends.  For example, a few years ago Robinson and HTO began threatening aviators using the airport that if their aircraft did not follow certain "voluntary" routes in their approaches into HTO—routes that are not even within HTO's airspace and thus are not subject to HTO's control—they would deny SVFR landing clearance (explained below), which they should otherwise have properly granted. Although Defendants' demands were clearly improper under federal regulations, we nonetheless complied with their demands.

12.     Defendants' attempt to force all flights into certain predetermined (less noisy) flight paths apparently did not sufficiently achieve its desired outcome.  Therefore, earlier this year, the Town came up with a new idea: refusing outright to grant SVFR clearances to otherwise qualified aircraft.

**Pilots Rely on Several Types of Flight Rules, Necessary for Safe Operations**

13.     All aircraft flying within the United States' airspace system operate under one of two sets of rules while in flight and while taking off and landing.  The first set of rules is Visual Flight Rules (VFR).    Under VFR, the pilot operates the aircraft by visual reference to the ground, and by visually avoiding obstructions and other aircraft. VFR is the most common mode of operation for small aircraft, including helicopters.

14.     VFR is permitted when cloud coverage and visibility meet VFR criteria. When flying through or above clouds, or in fog, rain, dust, the ground is not always visible. Under FAA rules, the minimum weather conditions necessary for ceiling and visibility for VFR flights vary

depending on the type of airspace in which the aircraft is operating, and on whether the flight is a daytime or nighttime flight. Typical daytime VFR minimums for most airspace, however, is three miles of flight visibility and a distance from clouds of 500 feet below, 1,000 feet above, and 2,000 feet horizontally.  Flight conditions equal to or greater than these minimums are known as visual meteorological conditions (VMC).

15.     The second set of rules pilots use is known as Instrument Flight Rules (IFR).  IFR governs flight under conditions in which VMC are not present and flight by outside visual reference may not be safe. During IFR flight, the pilot relies on the aircraft's instruments and instruments on the airport's surface, and navigates by reference to electronic signals.  As a result, when flying by IFR all aircraft follow specific, predetermined flight paths into the airport, an approach laid out for them electronically.

16.     While FAA regulations require all aircraft to have certain instruments on board, including some of those that are needed for IFR flight, not all aircraft are fully equipped for IFR flight.  Most single-engine helicopters like those that comprise our fleet cannot be certified for IFR.  This does not mean, however, that these aircraft need to be grounded during less-than-perfect weather conditions.  Even under certain circumstances when VMC are not present, FAA regulations allow a pilot to request from an airport traffic controller "Special VFR" (SVFR) clearance for takeoffs and landings.

17.     SVFR clearance permits a pilot to use VFR under conditions that practically allow for safe navigation but technically require IFR.  Pilots request—and control towers routinely grant—SVFR clearance when they determine that the pilot can safely take off, navigate, and/or land despite the absence of VMC.  For example, the cloud ceiling or horizontal visibility at a given airport might be just below the required minimums for VFR, but the pilot may nonetheless

be able to determine that his or her path to the airport has clear visibility and that he or she can safely land using visual navigation.  FAA orders lay out the factors a control tower must consider in deciding whether to grant or deny SVFR clearance, which is supposed to be considered on a case-by-case basis.  SVFR is particularly useful, appropriate, and important for helicopters because unlike a plane, a helicopter has the ability to fly as low and as slow as the pilot wishes—even stopping and hovering in one place—as long as he or she can see the ground.

18.     SVFR are most frequently used in situations involving localized weather conditions at or near an airport.  Such localized conditions are very common at the small airports on Eastern Long Island, which are located in low-lying, largely flat areas very close to the ocean. On days when the weather at the nearby beaches is sunny and beautiful, the areas surrounding the East End's airports can still trap patches of sea fog rising off the ocean.

**HTO Has Improperly Denied Zip and Other Aviation Companies the Ability to Fly into HTO Using SVFR**

19.     The policy of HTO's control tower, which Robinson operates, is to switch to IFR-only takeoffs and landings when the cloud ceiling is below 1000 feet or there is less than three miles of visibility.  When those conditions are present, the airport turns on its signal beacon and pilots must get clearance from the air traffic control tower to land using IFR or—at least in the past—SVFR.  In the summer near the ocean, there is almost always low cloud cover, meaning that HTO has almost always operated under IFR and/or by granting SVFR clearances to aircraft.

20.     Zip Aviation routinely takes off from and lands at the airports on Eastern Long Island and elsewhere in the New York region using SVFR under weather conditions not meeting VMC minimums.  In fact, Zip Aviation (along with many other aviation companies) has successfully used SVFR to take off and land at HTO itself for many years, without incident. While all of Zip's pilots are instrument-rated, Zip's helicopter fleet is not equipped with all of

the instruments necessary for IFR flights, and Zip has never needed them to service its clientele. Indeed, the minimum weather conditions for IFR are well above those under which FAA rules allow for SVFR, and Zip flies into all other airports with SVFR clearance under conditions sometimes below those required for IFR that are nonetheless authorized and completely safe.

21.     In March 2021, HTO suddenly announced that it would no longer grant *any* SVFR clearances for Class D flight operations.  (Attached as Exhibit 2 is a true and correct copy of HTO's March 17, 2021 Operations Memo published to operators using HTO, announcing that HTO would no longer grant requests for SVFR clearance.)  Class D airspace includes airspace within 2500 feet above an airport's elevation in the area surrounding an airport with an operational control tower.  Effectively, the newly announced policy meant that there would be no more SVFR takeoffs or landings from HTO.

22.     I, like other pilots and aviation company executives, was shocked at HTO's announcement that the airport would no longer be granting any SVFR clearances.  I could not believe that HTO would really enforce such a policy once the airport opened in May 2021, a policy that is not only contrary to FAA regulations but also effectively prevents so many aircraft from continuing to serve their many clients trying to reach East Hampton quickly.

23.     On April 27, 2021 HTO issued an operating procedures memo again announcing that, as a blanket rule, "Special VFR clearances will not be provided at HTO during Class D operations."  (A true and correct copy of HTO's April 27, 2021 memo is attached as Exhibit 3.)  Two days later, on April 29, 2021, HTO's Director, James Brundige, issued a memo to all helicopter operators, enclosing HTO's arrival and departure routes.  (A copy of Mr. Brundige's April 29, 2021 memo is attached as Exhibit 4.)  Once again, the memo stated that "Special VFR clearances will not be provided at HTO during Class D operations."  Once again, neither I nor

many other pilots and aviation professionals could believe the Town or its air traffic controllers from Robinson would actually enforce such an improper, arbitrary policy.

24.     Unfortunately, HTO indeed followed through on its announced policy.  On May 31, 2021 one of Zip's charter flights began approaching HTO.  Although the weather that day was not particularly bad, localized conditions fell below HTO's minimum requirements for VFR, and HTO implemented its IFR protocols.  Lacking sufficient instrumentation for IFR flight, Zip's pilot requested SVFR clearance for landing.  The control tower denied clearance.  This has happened again on numerous occasions since that time.

25.     I reached out to both HTO and Robinson to discuss this issue.  I met with HTO Airport Director James Brundige in June 2021.  During that meeting, he told me that he does not like allowing SVFR flight, and that the Town intended to stand by its policy.  In early July 2021, I spoke by phone with Tony Roetzel, the operations manager at Robinson, hoping that I could prevail upon him to see that the Town's new policy was contrary to FAA regulations, which Robinson and its employees operating the HTO control tower were supposed to be enforcing. Mr. Roetzel informed me that they had been hired by the Town to operate the control tower, and therefore they answer only to the Town.

**The Town's Policy Is Contrary to FAA Regulations**

26.     Others in my industry were equally unhappy with the "No SVFR" policy that the Town has implemented and that Robinson is enforcing.  As a result, one or more industry organizations contacted the FAA and brought the new Town policy to the FAA's attention.  The result was a series of communications between the FAA and the Town about the policy.

27.     My understanding is that on or about April 26, 2021 Mr. Brundige sent a memo concerning the Town's new policy to Troy Sica, the FAA's Plans and Procedures Specialist at

the New York Terminal Radar Approach Control (TRACON) Facilities, which is responsible for the safe, orderly, and expeditious flow of arrival, departure, and en-route air traffic. Although I have not seen this memo, my understanding is that it purported to cite safety concerns as the basis for the Town's new policy.

28.     Then, on May 24, 2021, my understanding is that Mr. Brundige wrote a letter to Marie Kennington Gardiner, Acting Regional Administrator for the FAA's Eastern Region, again defending the policy and citing putative safety concerns as the basis for the policy. This is consistent with what Mr. Brundige later told me when I spoke with him about the policy in June.

29.     Upon information and belief, however, the Town's decision to deny all requests for SVFR clearance has nothing to do with any safety concern. Rather, it is another attempt by the Town to severely restrict helicopter traffic to HTO, in order to reduce unwanted noise that the Town has not been able to curb otherwise. Indeed, Robinson operates 100 airports, and their controllers routinely authorize SVFR clearance.

30.     On June 30, 2021, Ms. Gardiner replied to Mr. Brundige. (A true and correct copy of Ms. Gardiner's June 30, 2021 letter to Mr. Brundige is attached as Exhibit 5.) In her response letter, Ms. Gardiner explained to Mr. Brundige that the Town's "No SVFR" policy is inconsistent with FAA regulations and federal law, which permit SVFR operations at any location not specifically prohibited by the regulations or exempted by them. Ms. Gardiner also pointed out that under the FAA regulation, SVFR clearance requests are supposed to be evaluated on a case-by-case basis with reference to factors enumerated by the FAA. Ms. Gardiner warned Mr. Brundige that HTO "lacks the authority to deny all requests for special VFR clearances," and that HTO is not a regulatory agency that can promulgate safety policy. As to safety, Ms. Gardiner also noted that the FAA has reviewed the reports of certain accidents Mr.

Brundige had cited in support of HTO's new policy, and found that those incidents were irrelevant to SVFR clearance and "not germane to this issue."  In sum, Ms. Gardiner warned Mr. Brundige that "to the extent that you are continuing to ban all special VFR clearances at HTO during Class D operations, you should remain aware that your decision is neither consistent with FAA policy nor Federal law."

31.     Despite Ms. Gardiner's June 30, 2021 letter, Robinson's air traffic controllers at the HTO tower have continued to enforce the Town's "No SVFR" policy, refusing to grant clearances for Zip's pilots to take off from or land at HTO using SVFR.

**The Town's Policy, and Robinson's Enforcement of that Policy, is Causing Severe, Irreparable Harm to Zip Aviation**

32.     The Town's decision to deny all requests for SVFR clearance, and Robinson's resolve to enforce that policy, have had a devastating effect on Zip Aviation's business.  This has caused Zip irreparable harm and continues to pose a threat of imminent irreparable harm on a daily basis.

33.     As I have noted above, Zip's helicopter fleet is not equipped for IFR flight.  With HTO denying all requests for SVFR clearance, Zip can therefore effectively no longer fly to HTO.  Even on apparently clear days, the risk of localized conditions developing at HTO mid-flight means that Zip cannot ever guarantee its passengers a landing at HTO.

34.     Given the nature of our business, Zip services a very demanding clientele.  Many of Zip's passengers desiring to travel to East Hampton simply will not accept an unplanned landing at another nearby airport, which will require additional travel by car to reach East Hampton.   Faced with the risk that they may depart New York City and land anywhere other than East Hampton, Zip's clients will decline to travel with Zip at all.  In these cases, Zip loses not one but *two* flights, because a customer who opts not to take the first flight out to East

Hampton and instead travels by car will not be chartering a flight back to New York when their stay in East Hampton ends, because the customer must return to New York City with his or her car.

35.     In addition to the incident noted above, for example, on July 4, 2021 a Zip charter flight left New York City's 30th St. Heliport carrying six passengers en route to HTO.  As the pilot approached HTO, localized weather conditions caused HTO to implement IFR protocols. Zip's pilot was denied SVFR landing clearance, and was forced to divert to the Southampton Heliport and land there under nearly identical weather conditions.  The Southampton Heliport is approximately 45 minutes from East Hampton Airport by car, causing significant inconvenience and nearly doubling the transit time for Zip's clients, thus depriving them of the primary benefit for which they agreed to pay thousands of dollars: a quick and easy trip.  These clients shared their dismay with me after the incident, and they will likely never fly with Zip to East Hampton again.  This is only one example of a situation that has occurred on numerous occasions.

36.     As of July 13, 2021, Zip has lost approximately 250 flights due to HTO's new policy, thanks to customers who have cancelled flights or declined to book with Zip altogether. The amount of revenue Zip realizes from each flight varies, but is between roughly $3,000 and $6,000 per flight.  Thus, lost flights have already cost Zip between $750,000 and $1,500,000. This already substantial loss of business continues to mount.  Moreover, flights to HTO comprise approximately 65% of Zip's business, so that the loss of our ability to fly to HTO has cost us nearly two-thirds of our business during these times.

37.     In addition to this number, Zip has suffered additional monetary losses thanks to aircraft that have been grounded at HTO unnecessarily due to HTO's refusal to grant SVFR clearance for takeoffs.  These aircraft were unavailable during these periods to fly other routes

for Zip, depriving Zip of the revenue it would have realized from those flights.  Moreover, Zip was forced to pay overtime to pilots who were grounded at HTO, waiting for conditions to change.

38.     It is not present revenue losses alone, however, that are causing the most harm to Zip.  It is the irreversible damage being inflicted upon Zip's reputation, the devastating effect on Zip's customer relationships, and the obliteration of the good will Zip has spent so many years building that pose the most concern to Zip.   These are injuries that cannot be measured in mere dollars and cents, and cannot be reversed.

39.     When a Zip customer learns that Zip cannot guarantee arrival in East Hampton, Zip is seen as an unreliable option for travel.  That customer instead goes and books another service, such as a sea plane, that has instruments allowing it to utilize IFR.  Worse, as noted, Zip has had passengers in route to East Hampton when the weather has changed to require IFR under HTO's policies, and Zip has had to transport those passengers to another airport (which grants SVFR clearances under the same conditions).  These customers will no longer fly with us anymore.   If there is a cloud anywhere in the sky—and often even when there isn't—these passengers will simply never book with us again.

40.     The Town's policy is decimating Zip's business, and an award of damages at some later date could never compensate for Zip's complete loss of all business to HTO.   In addition, a monetary award cannot make Zip whole for an unknown and unknowable amount of charters to other East End destinations lost as Zip's former East Hampton clients spread the word about their negative experience or their decision to find other means of transportation.

41.     Unable to fly to HTO, Zip will lose market share to other aviation companies and transportation options that Zip may never recover.  As noted, customers who determine that we

12

cannot fly to HTO have booked other means of reaching HTO and East Hampton, including sea planes with instruments sufficient to allow them to use IFR

42.    Because HTO has long been one of Zip's major summertime destinations, if Zip can no longer fly to HTO, Zip may be forced to downsize its fleet of aircraft, and correspondingly reduce its roster of pilots and other staff.  This would not only be a major blow to our morale, as we lose pilots and other personnel who have been with us for years and have become like family.  It would mean the loss of highly trained personnel that comprise a top-level staff that keeps our business functioning, a staff whose quality we might never be able to restore. This would be a major business disruption that could never be cured by monetary damages at the end of this litigation.

43.    In light of these circumstances, I respectfully request that the Court grant injunctive relief prohibiting the Town and Robinson from enforcing their illegal policy of denying all requests for SVFR clearance.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: New York, New York
        July 20, 2021

_____
                Itai Shoshani