UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ZIP AVIATION, LLC,

               Plaintiff,

      -against-

ROBINSON AVIATION (RVA), INC. and TOWN OF
EAST HAMPTON,

                    Defendants.

Case No. 2:21-cv-04111

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND <u>PRELIMINARY INJUNCTION</u>

DAVIS+GILBERT LLP
Joshua H. Epstein
jepstein@dglaw.com
David S. Greenberg
dgreenberg@dglaw.com
1675 Broadway
New York, NY 10019
(212) 468-4800


*Counsel for Plaintiff Zip Aviation, LLC*

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND ...............................................................................................4

ARGUMENT ..................................................................................................11

   I.   LEGAL STANDARD .................................................................................11

   II.   ZIP AVIATION WILL SUFFER IMMINENT, IRREPARABLE HARM IF THE
COURT DOES NOT ENJOIN THE TOWN'S POLICY ...........................................12

      A.   THE "NO SVFR POLICY" WILL CAUSE ZIP AVIATION SEVERE ECONOMIC
HARM AMOUNTING TO A SUBSTANTIAL LOSS OF BUSINESS ..........................12

      B.   THE "NO SVFR" POLICY IS CAUSING IRREPARABLE HARM TO ZIP'S GOOD
WILL, REPUTATION, CUSTOMER RELATIONSHIPS, AND MARKET SHARE ....................13

      C.   THE TOWN CANNOT BE ORDERED TO COMPENSATE ZIP FOR ITS ECONOMIC
HARM, MAKING THAT HARM FURTHER IRREPARABLE .................................14

   III.   ZIP IS LIKELY TO SUCCEED ON THE MERITS OF THIS CASE............................14

      A.   THE FEDERAL GOVERNMENT HAS OCCUPIED THE FIELD OF AVIATION
REGULATION IN THE UNITED STATES ..........................................15

      B.   THE "NO SVFR" POLICY VIOLATES THE AIRLINE DEREGULATION ACT OF 1978.........17

      C.   THE "NO SVFR" POLICY RUNS AFOUL OF THE AIRPORT NOISE AND CAPACITY
ACT OF 1990 AND CONSTITUTES AN IMPROPER ACCESS RESTRICTION .........................19

   IV.   AN INJUNCTION WOULD SERVE THE PUBLIC INTEREST, AND WOULD
BE EQUITABLE. ........................................................................21

CONCLUSION.......................................................................23

# **TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*Air Transp. Ass'n of Am. v. Cuomo*,
  520 F.3d 218 (2d Cir. 2008)..................................................................................15, 16, 18

*American Airlines, Inc. v. Wolens*,
  513 U.S. 219 (1995).............................................................................................................18

*Arapahoe County Public Airport Authority v. Federal Aviation Administration*,
  242 F.3d 1213 (10th Cir. 2001) .................................................................................18, 19, 22

*British Airways Bd. v. Port Auth. of N.Y.*,
  558 F.2d 75 (2d Cir. 1977)................................................................................................16

*Broker Genius, Inc. v. Volpone*,
  313 F. Supp. 3d 484 (S.D.N.Y. 2018)..........................................................................14, 15

*Chamber of Commerce of U.S. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) .........................................................................................22

*Charas v. Trans World Airlines, Inc.*,
  160 F.3d 1259 (9th Cir. 1998) ..........................................................................................18

*City of Burbank v. Lockheed Air Terminal, Inc.*,
  411 U.S. 624 (1973)....................................................................................................15, 16

*Doran v. Salem Inn, Inc.*,
  422 U.S. 922 (1975)............................................................................................................12

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009)..........................................................................................11, 12

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*,
  416 F. Supp. 3d 249 (E.D.N.Y. 2019) ...............................................................................11

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
  841 F.3d 133 (2d Cir. 2016)................................................................................... *passim*

*Hillside Med. Lab. v. Perales*,
  No. 88 Civ. 5644 (JFK), 1988 WL 100195 (S.D.N.Y. Sept. 22, 1988)..................................12

*Marsh USA Inc. v. Schuhriemen*,
  183 F. Supp. 3d 529 (S.D.N.Y. 2016) .................................................................................14

*Montalvo v. Spirit Airlines*,
   508 F.3d 464 (9th Cir. 2007) ........................................................................................16

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ......................................................................................................18

*Nat'l Helicopter Corp. of Am. v. City of N.Y.*,
   952 F. Supp. 1011 (S.D.N.Y. 1997), *aff'd in part, rev'd in part,* 137 F.3d 81
   (2d Cir. 1998) .......................................................................................................12, 14

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
   992 F.2d 430 (2d Cir. 1993) .........................................................................................12

*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
   612 F.3d 97 (2d Cir. 2010) ...........................................................................................15

*Pankos Diner Corp. v. Nassau Cnty. Legislature*,
   321 F. Supp. 2d 520 (E.D.N.Y. 2003) .........................................................................14

*Petereit v. S.B. Thomas, Inc.*,
   63 F.3d 1169 (2d Cir. 1995) .........................................................................................12

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) .........................................................................................13

*Rowe v. New Hampshire Motor Transport Ass'n*,
   552 U.S. 364 (2008) ......................................................................................................18

*RxUSA Wholesale, Inc. v. Dep't of Health & Human Servs.*,
   467 F. Supp. 2d 285 (E.D.N.Y. 2006), *aff'd,* 285 F. App'x 809 (2d Cir. 2008).....................15

*Ticor Title Ins. Co.,* 173 F.3d 63, 68 (2d Cir. 1999) ...........................................................14

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
   60 F.3d 27 (2d Cir. 1995) .............................................................................................12

*Tweed-New Haven Airport Auth. v. Tong*,
   930 F.3d 65 (2d Cir. 2019) ...........................................................................................15

**Statutes**

47 U.S.C. § 47521 *et seq.*.......................................................................................................19

49 U.S.C. § 40101 ...................................................................................................................19

49 U.S.C. § 41713 ................................................................................................17, 18, 19, 21

49 U.S.C. § 47521 ........................................................................................................ *passim*

49 U.S.C. § 47524............................................................................................................20

49 U.S.C. § 40102(a)(2)....................................................................................................18

**Other Authorities**

14 CFR § 91.157...............................................................................................................16

14 CFR § 161.5.................................................................................................................21

FAA Order JO 7110.65, § 5.....................................................................................7, 8, 16, 17

Plaintiff Zip Aviation, LLC ("Plaintiff, "Zip Aviation" or simply "Zip") respectfully submits this memorandum of law in support of its application for a temporary restraining order and preliminary injunction barring defendants, Robinson Aviation (RVA), Inc. ("Robinson") and the Town of East Hampton (the "Town" or "East Hampton") (together, "Defendants") from enforcing a recently announced policy of denying all aircraft flying into and out of East Hampton Airport ("HTO," which is the International Air Transportation Association code for the airport) clearance to take off and land using "Special Visual Flight Rules" ("SVFR").

## PRELIMINARY STATEMENT

Federal law is supreme on the issue of regulating aviation in the United States. Congress has enacted comprehensive statutes, and the U.S. Department of Transportation and its Federal Aviation Administration have promulgated an extensive scheme of regulations and orders governing aviation in U.S. airspace. Given the importance of an efficient yet safe national air transportation system, federal law preempts state and local law in this arena. This system is not good enough for the Town of East Hampton, however, which is attempting, once again, to create its own aviation rules. The Town is wrong, but if the Court does not grant emergency relief enjoining the Town from enforcing those rules, plaintiff Zip Aviation may not be here at the end of this case to see its interests vindicated.

The Town recently announced a new policy in connection with its operation of East Hampton Airport, an important regional airport utilized by thousands of airplane and helicopter flights every year. For years, Zip Aviation and myriad other aviation companies have been flying into HTO utilizing (when necessary) "Special Visual Flight Rules" ("SVFR") to take off and land their aircraft there. This is what Zip and the other companies do at dozens of other airports in the Northeastern United States, and this is what pilots do throughout the country. Consistent with Federal Aviation Administration (FAA) Rules and Regulations, Robinson's air traffic controllers

at HTO have always received pilots' requests to use SVFR when weather conditions do not otherwise permit the use of "Visual Flight Rules," and for years those controllers have done what the FAA requires them to do:  assess each request on a case-by-case basis and grant or deny SVFR clearance, taking into account various relevant factors.  Under the Town's newly announced policy, however, Robinson's air traffic controllers at HTO will issue blanket denials of any and all SVFR requests.

The Town's policy would have disastrous consequences for Zip, which operates a fleet of helicopters that fly passengers to and from HTO an average of 5-6 times each day.  Zip's helicopters are not equipped to navigate using instruments alone, nor do they need to be so equipped under federal regulations.  They therefore rely heavily on the availability of SVFR clearance in the event of suboptimal meteorological conditions, which routinely develop at and around HTO and other East End airports—including while Zip's pilots are en route.  If HTO intends to disregard FAA regulations and refuse to grant any SVFR clearances, Zip's business will be decimated.  Approximately two thirds of Zip's business consists of charter flights to HTO, and that substantial majority of Zip's business will be completely lost.

There is no legitimate safety reason for HTO to stop issuing all SVFR clearances.  Other airports grant these clearances all the time, especially to helicopters.  Rather than being about safety, the Town's new policy is about another issue: noise control.  This is an issue the Town has attempted to address for many years, in numerous ways.

This is not the first time the Town has attempted to improperly regulate access to HTO.  In 2015, the Town attempted to impose curfews and restrictions on aircraft, which were explicitly designed to control noise around HTO.  A group of airport users and aviation companies brought suit here in the Eastern District to stop the Town's improper attempt to expand the controls put in

place by the FAA.  This District Court granted an injunction stopping the Town from enforcing one of the laws it had tried to foist upon aviators, and the Second Circuit expanded that injunction to reach all three laws the Town had enacted, finding that federal law preempted the Town's attempted local legislation.  The Court should do the same here.

 As discussed below, Zip meets all of the necessary criteria for the issuance of a temporary restraining order and preliminary injunction.

First, Zip faces the threat of imminent, irreparable harm in the absence of an injunction. As a result of the Town's new policy, Zip can effectively no longer fly its helicopter fleet to or from HTO, its number one destination, accounting for approximately 65% of Zip's business.  The damage to Zip's reputation, good will, and customer relationships has already taken a severe blow, and will only worsen until Zip's access to HTO is restored.

Second, Zip can demonstrate a likelihood of success on the merits.  Zip's complaint seeks a declaration that the Town's policy is inconsistent with federal law and FAA rules, and an injunction barring the Town from attempting to carry out that policy.  It is clear that the Town's "No SVFR" policy is contrary to FAA regulations, which permit SVFR operations at any location not prohibited by the regulations or exempted by agreement, neither of which condition is present with respect to HTO.  Indeed, FAA rules provide that SVFR clearances are to be assessed on a case-by-case basis, with reference to specific factors the FAA itself has spelled out.  The Town lacks authority to implement a blanket policy of denying all requests, and is encroaching on the FAA's exclusive authority.  In fact, the Town policy amounts to an improper access restriction under the Airport Noise and Capacity Act of 1990.  These conclusions are clear, not least *because the FAA itself has stated them*.

Third, and finally, an injunction here will serve the public interest by enjoining the

enforcement of improper regulations.   Moreover, the balance of any hardship here tips conclusively in plaintiff's favor.  Without an injunction, Zip may not survive until the conclusion of this case; if it does, it may be a different, smaller company.  Meanwhile, if the Court grants an injunction, the Town will simply be required to do what the FAA prescribes, and what the Town has been doing for decades: allow Robinson to continue evaluating SVFR clearance requests on a case-by-case basis, and grant those clearances when they are appropriate.

For all of the reasons that follow, the Court should grant Zip's request for a temporary restraining order and preliminary injunction, and stop the Town from implementing its illegal policy and destroying Zip's (and other aviators') business.

## **FACTUAL BACKGROUND**

Plaintiff Zip Aviation was founded in 2004. (Shoshani Dec., ¶ 5.)  The company started as a single helicopter offering aerial tours of New York City.  (*Id.*)  Over the next 20 years, Zip's fleet has grown to eight helicopters, offering private charter services from New York City's 30th Street Heliport to airports around the entire Northeast United States, in addition to the aerial tours with which the company began. (*Id.*)  Zip has an excellent safety record.  It employs experienced and highly trained pilot crew, certified by the Federal Aviation Administration (FAA), who operate highly-maintained and well-equipped aircraft. (*Id.* ¶ 6.)

**Zip's Long History of Successful Flights to HTO**

The East End of Long Island, including the Hamptons and East Hampton in particular, have long been Zip's most popular charter destinations out of New York City.   (*Id.* ¶ 7.) Helicopter flights change what could otherwise be a three- to four-hour trip to East Hampton by car or train into a trip of under an hour of flight time, and usually under two hours, door-to-door. (*Id.*)

HTO has long been the busiest airport for helicopter traffic on the East End.  (*Id.* ¶ 8.) The FAA has designated HTO as a "regional" facility in its National Plan of Integrated Airport Systems (NPIAS), only one step below the top-level "national" category of non-primary airports. (*Id.* and Ex. 1.) In the summertime, Zip generally flies an average of 5-6 flights to or from HTO per day.  On weekends, Zip sometimes flies as many as 15-20 flights per day.   Over the past five years, Zip Aviation has made over 1000 flights to/from HTO.  (*Id.* ¶ 9.)

**East Hampton's Attempts to Regulate Aircraft Noise in Violation of FAA Rules**

For several years, the Town has been attempting to find ways to reduce aircraft noise.  In 2015 the Town attempted to enact local laws that imposed curfews on most aircraft utilizing HTO and a two-operations-per-week limit on such aircraft's use of HTO. (*Id.* ¶ 10.)  These laws led to a lawsuit and an injunction prohibiting the Town from enforcing them, which were inconsistent with FAA regulations.  *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 136 (2d Cir. 2016).

Subsequently, the Town sought other ways to curb noise.  A few years ago, for example, Defendants began threatening airport users that if their aircraft did not follow certain "voluntary" routes on approach to HTO—routes that are not within HTO's airspace and not subject to HTO's control—the tower would deny SVFR landing clearance (explained below).  (Shoshani Dec., ¶ 11.)   Defendants' attempt to force all flights into certain predetermined (less noisy) flight paths apparently did not sufficiently achieve its desired outcome, however.  (*Id.* ¶ 12.)

**Pilots Rely on Several Types of Flight Rules, Necessary for Safe Operations**

All aircraft flying within the United States' airspace system operate under one of two sets of rules while in flight and while taking off and landing.  (*Id.* ¶ 13.)  The first set of rules is Visual Flight Rules (VFR).   Under VFR, the pilot operates the aircraft by visual reference to the ground,

and by visually avoiding obstructions and other aircraft.  VFR is the most common mode of operation for small aircraft, including helicopters. (*Id.*)

VFR is permitted when cloud coverage and visibility meet VFR criteria. (*Id.* ¶ 14.)   When flying through or above clouds, or in fog, rain, dust, the ground is not always visible. (*Id.*)   Under FAA rules, the minimum weather conditions necessary for ceiling and visibility for VFR flights vary depending on the type of airspace in which the aircraft is operating, and on whether the flight is a daytime or nighttime flight. (*Id.*)   Typical daytime VFR minimums for most airspace, however, is three miles of flight visibility and a distance from clouds of 500 feet below, 1,000 feet above, and 2,000 feet horizontally.  Flight conditions equal to or greater than these minimums are known as visual meteorological conditions (VMC).  (*Id.*)

The second set of rules pilots use is known as Instrument Flight Rules (IFR).  IFR governs flight under conditions in which VMC are not present and flight by outside visual reference may not be safe. (*Id.* ¶ 15.)   During IFR flight, the pilot relies on the aircraft's instruments and instruments on the airport's surface, and navigates by reference to electronic signals.  (*Id.*)  As a result, when flying by IFR all aircraft follow one specific, predetermined flight path into the airport, an approach laid out for them electronically.  (*Id.*)

While FAA regulations require all aircraft to have certain instruments on board, including some of those that are needed for IFR flight, not all aircraft are fully equipped for IFR flight.  (*Id.* ¶ 16.)  This does not mean, however, that these aircraft need to be grounded during less-than-perfect weather conditions.  Even under certain circumstances when VMC are not present, FAA regulations allow a pilot to request from an airport traffic controller "Special VFR" (SVFR) clearance for takeoffs and landings.  (*Id.*)

SVFR clearance permits a pilot to use VFR under conditions that practically allow for safe navigation but technically require IFR.  (*Id.* ¶ 17.)  Pilots request—and control towers routinely grant—SVFR clearance when they determine that the pilot can safely take off, navigate, and/or land despite the absence of VMC.  (*Id.*)  For example, the cloud ceiling or horizontal visibility at a given airport might be just below the required minimums for VFR, but the pilot my nonetheless be able to determine that his or her path to the airport has clear visibility and that he or she can safely land using visual navigation.  (*Id.*)  FAA orders lay out the factors a control tower must consider in deciding whether to grant or deny SVFR clearance, which is supposed to be considered on a case-by-case basis.  (*See* FAA Order JO 7110.65, § 5.)   SVFR is particularly useful, appropriate, and important for helicopters because a helicopter has the ability to fly as low and as slow as the pilot wishes, as long as he or she can see the ground. (*Id.*)

SVFR are most frequently used in situations involving localized weather conditions at or near an airport.  (*Id.* ¶ 18.)  Such localized conditions are very common at the small airports on Eastern Long Island, which are located in low-lying, largely flat areas very close to the ocean. (*Id.*) On days when the weather at the nearby beaches is sunny and beautiful, the areas surrounding the East End's airports can still trap patches of sea fog rising off the ocean.  (*Id.*)

**HTO Has Improperly Denied Zip and Other Aviation Companies the Ability to Fly into HTO Using SVFR, and Has Massively Harmed Zip**

The policy of HTO's control tower, which Robinson operates, is to switch to IFR-only takeoffs and landings when the cloud ceiling is below 1000 feet or there is less than three miles of visibility.  (*Id.* ¶ 19.)  When those conditions are present, the airport turns on its signal beacon and pilots must get clearance from the air traffic control tower to land using IFR or—at least in the past—SVFR.  (*Id.*)  In the summer near the ocean, there is almost always low cloud cover,

meaning that HTO has almost always operated under IFR and/or by granting SVFR clearances to aircraft. (*Id.*)

Zip Aviation routinely takes off from and lands at the airports on Eastern Long Island and elsewhere in the New York region using SVFR under weather conditions not meeting VMC minimums. (*Id.* ¶ 20.) In fact, Zip Aviation (along with myriad other aviation companies) has successfully used SVFR to take off and land at HTO itself for many years, without any incident. (*Id.*) While all of Zip's pilots are instrument-rated, Zip's helicopter fleet is not equipped with all of the instruments necessary for IFR flights, and Zip has never needed them to service its clientele. (*Id.*) Indeed, the minimum weather conditions for IFR are well above those under which FAA rules allow for SVFR, and Zip flies into all other airports with SVFR clearance under conditions sometimes below those required for IFR that are nonetheless authorized and completely safe. (*Id.*)

In March 2021, HTO suddenly announced that it would no longer grant *any* SVFR clearances for Class D flight operations. (*Id.* ¶ 21 and Ex. 2.) Class D airspace includes airspace within 2500 feet above an airport's elevation in the area surrounding an airport with an operational control tower. (*Id.*) Effectively, the newly announced policy meant that there would be no more SVFR takeoffs or landings from HTO. Then, on April 27, 2021 HTO issued an operating procedures memo again announcing that, as a blanket rule, "Special VFR clearances will not be provided at HTO during Class D operations." (*Id.* ¶ 23 and Ex. 3.) Two days later, on April 29, 2021, HTO's Director, James Brundige, issued a memo to all helicopter operators, enclosing HTO's arrival and departure routes. (*Id.* ¶ 23 and Ex. 4.) Once again, the memo stated that "Special VFR clearances will not be provided at HTO during Class D operations."

After HTO opened for the season, on May 31, 2021 one of Zip's charter flights began approaching HTO. (*Id.* ¶ 24.) Although the weather that day was not particularly bad, localized

conditions fell below HTO's minimum requirements for VFR, and HTO implemented its IFR protocols.  Lacking sufficient instrumentation for IFR flight, Zip's pilot requested SVFR clearance for landing.  (*Id.*)  The control tower denied clearance, and the flight had to be diverted. (*Id.*)   This has happened again on numerous occasions since that time.  For one additional example, on July 4, 2021 a Zip charter flight left New York City's 30th St. Heliport carrying six passengers en route to HTO.  (*Id.* ¶ 35.)  As the pilot approached HTO, localized weather conditions caused HTO to implement IFR protocols.  (*Id.*)  Zip's pilot was denied SVFR landing clearance, and was forced to divert to the Southampton Heliport and land there under nearly identical weather conditions.  (*Id.*) The Southampton Heliport is approximately 45 minutes from East Hampton Airport by car, causing significant inconvenience and nearly doubling the transit time for Zip's clients, thus depriving them of the primary benefit for which they agreed to pay thousands of dollars: a quick and easy trip.  (*Id.*)  These clients have indicated to Zip they will likely never fly with Zip to East Hampton again.  (*Id.*)

As of July 13, 2021, Zip has lost approximately 250 flights due to HTO's new policy, thanks to customers who have cancelled flights or declined to book with Zip altogether, costing Zip between $750,000 and $1,500,000. (*Id.* ¶ 36.)   This already substantial loss of business continues to mount.  Flights to HTO comprise approximately 65% of Zip's business, so the inability to fly to HTO has cost Zip nearly two-thirds of its business. Zip has also suffered additional monetary losses thanks to aircraft that have been grounded at HTO due to HTO's refusal to grant SVFR clearance for takeoffs.  (*Id.* ¶ 37.)  These aircraft were unavailable during these periods to fly other routes for Zip, depriving Zip of the revenue it would have realized from those flights, and Zip was forced to pay overtime to pilots who were grounded at HTO.  (*Id.*)

Revenue losses aside, Zip's reputation, its customer relationships, and the good will Zip has spent years building are taking immeasurable and irreversible harm. (*Id.* ¶ 38.) Customers who learn that Zip cannot guarantee arrival in East Hampton, see Zip as unreliable and book other services or make other travel arrangements. (*Id.* ¶ 39.) Passengers en route to HTO when the weather has changed to have had to land elsewhere, and will no longer fly with Zip. Zip is losing market share to other transportation options, and may be forced to downsize its fleet of aircraft, and reduce its roster of pilots and staff. (*Id.* ¶ 42.)

**The FAA Has Opined That the Town's Policy Runs Afoul of Federal Regulations**

Both Zip and others in the industry were unhappy with the Town's "No SVFR" policy. (*Id.* ¶ 26.) As a result, one or more industry organizations contacted the FAA and brought the new Town policy to the FAA's attention. (*Id.*) The result was a series of communications between the FAA and the Town about the policy.

On or about April 26, 2021 HTO Airport Director James Brundige sent a memo concerning the Town's new policy to Troy Sica, the FAA's Plans and Procedures Specialist at the New York Terminal Radar Approach Control (TRACON) Facilities, which is responsible for the safe, orderly, and expeditious flow of arrival, departure, and en-route air traffic. This memo purported to cite safety concerns as the basis for the Town's new policy. (*Id.* ¶ 27.) Then, on or about May 24, 2021 Mr. Brundige wrote a letter to Marie Kennington Gardiner, Acting Regional Administrator for the FAA's Eastern Region, again defending the policy and citing putative safety concerns as the basis for the policy.

On June 30, 2021, Ms. Gardiner replied to Mr. Brundige. (*Id.* ¶ 30 and Ex. 5.) Ms. Gardiner's letter explained that the Town's "No SVFR" policy is inconsistent with FAA regulations and federal law, which permit SVFR operations at any location not specifically

prohibited by the regulations or exempted by them.   (*Id.*)   Ms. Gardiner also pointed out that under the FAA regulation, SVFR clearance requests are supposed to be evaluated on a case-by-case basis with reference to factors enumerated by the FAA.   (*Id.*)   Ms. Gardiner warned Mr. Brundige that HTO "lacks the authority to deny all requests for special VFR clearances," and that HTO is not a regulatory that can promulgate safety policy.   (*Id.*)   As to safety, Ms. Gardiner noted that the FAA has reviewed the reports of certain accidents Mr. Brundige had cited in support of HTO's new policy, and found that those incidents were irrelevant to SVFR clearance and "not germane to this issue."   (*Id.*)   Ms. Gardiner's letter warned Mr. Brundige that "to the extent that you are continuing to ban all special VFR clearances at HTO during Class D operations, you should remain aware that your decision is neither consistent with FAA policy nor Federal law." (*Id.*)

Despite Ms. Gardiner's June 30, 2021 letter, Robinson's air traffic controllers at the HTO tower have continued to enforce the Town's "No SVFR" policy.   (*Id.* ¶ 31.)

## ARGUMENT

### I.  LEGAL STANDARD

A party seeking injunctive relief in connection with governmental action must demonstrate: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction."   *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).   The same standards apply to the issuance of a temporary restraining order.   *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 416 F. Supp. 3d 249, 251 (E.D.N.Y. 2019).   Of the three required factors, a "showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).

## II.  ZIP AVIATION WILL SUFFER IMMINENT, IRREPARABLE HARM IF THE COURT DOES NOT ENJOIN THE TOWN'S POLICY

To show irreparable harm, a plaintiff "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" *Faiveley*, 559 F.3d at 118.  "A 'substantial loss of business,' particularly where there is a threat of bankruptcy, constitutes irreparable injury sufficient to satisfy this standard." *Nat'l Helicopter Corp. of Am. v. City of N.Y.*, 952 F. Supp. 1011, 1018 (S.D.N.Y. 1997), *aff'd in part, rev'd in part,* 137 F.3d 81 (2d Cir. 1998).  As the Second Circuit has explained, "[m]ajor disruption of a business can be as harmful as its termination and thereby constitute irreparable injury." *Petereit v. S.B. Thomas, Inc*., 63 F.3d 1169, 1186 (2d Cir. 1995).  Loss of good will is harm that this Court's sister courts have described as "particularly suited to a claim for injunctive relief."  *Nat'l Helicopter*, 952 F. Supp. at 1018.

### A.  THE "NO SVFR POLICY" WILL CAUSE ZIP AVIATION SEVERE ECONOMIC HARM AMOUNTING TO A SUBSTANTIAL LOSS OF BUSINESS

"Destruction of a business itself" defies monetary calculation, and renders an award of monetary damages "a hollow promise." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (affirming grant of interim relief where, because of the irreparable harm, "a favorable final judgment might well be useless").   Moreover, losing essential equipment and laying-off personnel constitute "major business disruptions" and amount to irreparable harm, even if a plaintiff's business does not go under completely. *See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp*., 992 F.2d 430, 435 (2d Cir. 1993); *Hillside Med. Lab. v. Perales*, No. 88 Civ. 5644 (JFK), 1988 WL 100195, at *2 (S.D.N.Y. Sept. 22, 1988) (layoffs and salary reductions constituted irreparable harm).

As explained in the Shoshani Declaration, the Town's "No SVFR" policy and Robinson's implementation of that policy have already wrought massive economic harm on Zip. Zip's helicopter fleet is not equipped for IFR, and therefore cannot fly to HTO as long as there is a possibility that HTO will switch to IFR protocols and deny SVFR clearance. (*See* Shoshani Dec., ¶ 33.) Zip services a demanding clientele, who will not accept an unplanned landing at another nearby airport, and therefore will decline to travel with Zip. (*Id.* ¶ 34.) As of July 13, 2021, Zip had lost approximately 250 flights due to HTO's new policy, thanks to customers who have cancelled flights or declined to book with Zip altogether. (*Id.* ¶ 36.) The amount of revenue Zip realizes from each flight varies, but is between roughly $3,000 and $6,000 per flight. (*Id..*) Thus, lost flights have already cost Zip between $750,000 and $1,500,000. () More importantly, Zip's flights to HTO comprise approximately 65% of Zip's business. (*Id.*) **If the "No SVFR" policy is allowed to stand, Zip will lose nearly two-thirds of its business.** (*Id.*) Standing on its own, this amounts to a "substantial loss of business" constituting irreparable harm.

Moreover, the "No SVFR" Policy will cause Zip to lose the intangible benefits of having long-serving, highly skilled staff. Faced with a loss of 65% of its business, Zip will almost certainly be forced to downsize its aircraft fleet and reduce its roster of pilots and other employees. Aside from the effect on company morale, this would mean the loss of highly trained personnel that comprise a top-level staff. Once they are gone, Zip would likely be unable to restore the composition and quality of its staff. (*Id.* ¶ 42.) This loss of key personnel cannot remedied at the end of the case. Only an injunction now can help prevent it.

## B. The "No SVFR" Policy Is Causing Irreparable Harm to Zip's Good Will, Reputation, Customer Relationships, and Market Share

Loss of client relationships, reputation, goodwill, business opportunities, and current and future market share constitute irreparable harm. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393,

404 (2d Cir. 2004); *Ticor Title Ins. Co.,* 173 F.3d 63, 68 (2d Cir. 1999); *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 536 (S.D.N.Y. 2016).

Zip has already endured multiple incidents in which flights to HTO have been denied SVFR clearance, and have been diverted elsewhere for landing.  (Shoshani Dec. ¶ 34-35.)  This has resulted in dismayed passengers, who have informed Zip they will not be flying with Zip to East Hampton again.  (*Id.* ¶ 35.)  Incidents like this, and Zip's inability to promise landings at HTO under any weather conditions, have taken a severe toll on Zip's reputation, and have obliterated good will that Zip spend years building.  (*Id.* ¶ 38.)   The spread of unhappy customer experiences have damaged and threaten to destroy Zip's share of the East End transportation market.  (*Id.* ¶ 41.)   These all constitute additional imminent, irreparable harm sufficient to warrant injunctive relief.

### C.  THE TOWN CANNOT BE ORDERED TO COMPENSATE ZIP FOR ITS ECONOMIC HARM, MAKING THAT HARM FURTHER IRREPARABLE

Even assuming arguendo that the damage the Policy is causing could be measured, the harm to Zip is nonetheless irreparable.   This is because Zip has no legal cause of action against the Town.  Numerous courts have held that a plaintiff cannot recover money damages arising out of regulatory action taken by local governments. *See Pankos Diner Corp. v. Nassau Cnty. Legislature*, 321 F. Supp. 2d 520, 524 (E.D.N.Y. 2003); *Nat'l Helicopter Corp.*, 952 F. Supp. at 1020 n.4 (granting injunctive relief because Eleventh Amendment would bar federal suit against City for monetary relief). For this additional reason, the Court should grant an injunction prohibiting the Town and Robinson from further implementing the "No SVFR" Policy.

### III.    ZIP IS LIKELY TO SUCCEED ON THE MERITS OF THIS CASE

To demonstrate a likelihood of success on the merits, the plaintiff need not prove that success is an "absolute certainty." *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497

(S.D.N.Y. 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).  Rather, plaintiffs need only demonstrate that their probability of prevailing is better than fifty percent.  *See id.*; *RxUSA Wholesale, Inc. v. Dep't of Health & Human Servs.*, 467 F. Supp. 2d 285, 288–89 (E.D.N.Y. 2006), *aff'd*, 285 F. App'x 809 (2d Cir. 2008).

Zip can easily demonstrate that it has a better than 50% chance of success on the merits in this case.  This is clear from federal statutory law, federal regulations, and pronouncements from the FAA itself—all of which show that the Policy is contrary to federal law, and therefore preempted.

## A. THE FEDERAL GOVERNMENT HAS OCCUPIED THE FIELD OF AVIATION REGULATION IN THE UNITED STATES

Under the Constitution's Supremacy Clause, state and local laws that conflict with federal law are "without effect."  *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010).  As the Second Circuit has explained,

> In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, "where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law"; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

*Id.* at 104.

The Federal Aviation Act "impliedly preempts the entire field of air safety." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 74 (2d Cir. 2019).  "The FAA was enacted to create a 'uniform and exclusive system of federal regulation' in the field of air safety." *Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218, 224 (2d Cir. 2008) quoting *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 639 (1973)).  As the Supreme Court held in *City of Burbank*, "[t]he network of airports throughout the United States and the constant availability of these airports are essential to the maintenance of a sound air transportation system." *City of Burbank*, 411 U.S. at

640.   For this reason, Congress centralized all regulatory authority over our national air transportation system in the FAA.  *See id.*   "[L]egitimate concern for safe and efficient air transportation requires that exclusive control of airspace management be concentrated at the national level." *British Airways Bd. v. Port Auth. of N.Y.*, 558 F.2d 75, 83 (2d Cir. 1977).

Numerous Courts of Appeal have held that in light of Congress's intent to preempt the entire field, state and local governments are not permitted to vary federal aviation safety standards. *See Air Transp. Ass'n*, 520 F.3d at 225; *Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007).   Indeed, "the [Federal Aviation Act] and regulations promulgated pursuant to [the Act] establish complete and thorough safety standards for air travel, *which are not subject to supplementation by, or variation among*, state laws."   *Montalvo*, 508 F. 3d at 468 (emphasis added).

The Federal Aviation Act and the implementing regulations promulgated pursuant to the Act clearly preempt the Town's Policy in this case.  FAA regulations specifically contemplate the availability of SVFR clearances, and permit SVFR operations at any location not prohibited by the regulations or otherwise exempted from them.  *See* 14 CFR § 91.157.  HTO is not a location at which SVFR operations have been prohibited, and HTO has not even sought prohibition of certain SVFR operations under Appendix D or an exemption. *See* 14 CFR Part 91, Appendix D (listing airports at which special operations are prohibited, and omitting HTO). (*See* Shoshani Dec., Ex. 5., at p.1 n.3.)   Indeed, Zip's' helicopters and other airport users have been successfully using SVFR to take off and land at HTO for years.  (*See* Shoshani Dec., ¶ 20.)

Similarly, the FAA's policy, as reflected in FAA orders, call for the issuance of SVFR clearance on a case-by-case basis, and prescribe the considerations airport control towers should consult in reviewing SVFR clearance requests and granting or denying those requests.  *See* FAA

Order JO 7110.65T, § 5.[1]  In fact, the FAA itself has informed the Town that the FAA preempts

local regulations, and that HTO is not allowed to ban all SVFR operations.  (*See* Shoshani Dec.,

Ex. 30.)  In the words of the FAA's Acting Regional Administrator in her June 30, 2021 letter to

HTO's director:

> [N]o State or local government has authority to regulate flight altitude, flight paths,
> operational bans, or any regulation of the navigable airspace. By banning special
> VFR clearances, you are encroaching on the FAA's exclusive authority to fulfill its
> safety and airspace oversight responsibilities.

(*Id.*)

Robinson and the Town have claimed that their Policy is driven by safety concerns.  (*See*

Shoshani Dec. ¶¶ 27-28 and Ex. 5.)  Even assuming *arguendo* that this assertion is true, it is

irrelevant.   Given the FAA's exclusive authority over air safety, the Town does not get a vote as

to whether SVFR operations are safe.  As the FAA has informed the Town, HTO is not permitted

to "promulgate safety policy".  (*Id.*, Ex. 5.)  Federal law and regulations preempt the Policy.

## B.  THE "NO SVFR" POLICY VIOLATES THE AIRLINE DEREGULATION ACT OF 1978

In addition to Congress's implied preemption of the entire field of air safety, in certain

instances, Congress has expressly preempted state and local action in the field of aviation.  The

Airline Deregulation Act of 1978 ("ADA"), for example, contains an express preemption

provision that prohibits state and local governments from acting to limit air carriers' routes and

service:

> Except as provided in this subsection, a State, political subdivision of a State, or
> political authority of at least 2 States may not enact or enforce a law, regulation, or
> other provision having the force and effect of law related to a price, route, or
> service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713.

The ADA preempts state provisions where the provisions "relate to" the price, route or

---

[1] Available at https://tfmlearning.faa.gov/publications/atpubs/ATC/atc0705.html.

17

service of an air carrier.[2]  The Supreme Court has defined the phrase "relating to" as "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).   The statute's use of "relating to" expresses "a broad pre-emptive purpose" to preempt all "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes or services.'" *Id.* at 383–84. The Supreme Court "has repeatedly emphasized the breadth of the ADA's preemption provision." *Air Transp. Ass'n*, F.3d at 222; *see also American Airlines, Inc. v. Wolens*, 513 U.S. 219, 225–26 (1995); *Morales*, 504 U.S. at 383–84.   Indeed, the ADA preempts state provisions even if their effect on routes or services "is only indirect." *Cf. Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 370 (2008) (preemption provision of federal law that barred states from enacting provisions "related to" a motor carrier "price, route or service" preempted state law regulating the delivery of tobacco to customers with the state).

A state statute or provision relates to air carriers' "service" where it effectively "curtail[s] an air carrier's business decision to offer a particular service in a particular market." *Arapahoe County Public Airport Authority v. Federal Aviation Administration*, 242 F.3d 1213, 1222 (10th Cir. 2001) (holding that ADA preempted airport from banning scheduled air carrier service); *see also Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265–66 (9th Cir. 1998) (holding that "service" refers to such things as "the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided . . . .")

The ADA expressly preempts the Town's "No SVFR" Policy.  The Policy clearly "relates" to the routes and services of Zip Aviation and other air carriers.  When HTO implements IFR protocols, Zip and other carriers using single-engine helicopters are forced to land elsewhere, or

---

[2] An "air carrier" is "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation."  49 U.S.C. § 40102(a)(2).

are forced to sit on the ground, both under conditions which the FAA has otherwise deemed SVFR operations available.  (*See* Shoshani Dec. ¶¶ 24, 33, 35.)  As a practical matter, these carriers can no longer fly to HTO at all, because they can never guarantee a landing at HTO or a departure from HTO once there.  (*Id.* ¶ 33.)  Thus, the Policy "curtails" Zip's ability to offer service to HTO and "significantly impacts the scope of services available to public citizens desiring to travel by air" to or from HTO.  *See Arapahoe*, 242 F.3d at 1222.  The ADA's objective was to enhance "the availability of a variety of adequate, economic, efficient, and low-priced services," and to "encourag[e] entry into air transportation markets by new and existing air carriers and the continued strengthening of small air carriers to ensure a more effective and competitive airline industry.." 49 U.S.C. §§ 40101(4), 40101(13).  HTO's Policy thwarts this objective.

The Town's Policy banning SVFR operations can have adverse effects on other area airports, forcing them to absorb flights that otherwise would have gone to HTO.   The Policy thus impacts the national aviation system, which is under the province of the FAA.   The ADA expressly preempts the Town's Policy.

### C. The "No SVFR" Policy Runs Afoul of the Airport Noise and Capacity Act of 1990 and Constitutes an Improper Access Restriction

The Airport Noise and Capacity Act of 1990 ("ANCA") forbids airport operators from imposing airport noise or access restrictions without first complying with ANCA's requirements. *See* 47 U.S.C. § 47521 *et seq.*  Finding that local community noise concerns had "led to uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system," Congress determined that a "noise policy must be carried out at the national level."  49 U.S.C. § 47521.  Under ANCA, airport proprietors are not permitted to impose

any noise or access restrictions on aircraft classified as "Stage 3" or "Stage 4" aircraft[3] without first securing FAA approval or the unanimous consent of all operators affected by the restrictions. *See* 49 U.S.C. § 47524.  ANCA also prohibits those proprietors from imposing any noise or access restriction on Stage 2 aircraft (which includes most helicopters) unless the proprietor first publishes for public comment, 180 days before implementing the restriction, certain required analyses and studies mandated by federal requirements, including:

> 1) an analysis of the anticipated or actual costs and benefits of the existing or proposed restriction;
>
> (2) a description of alternative restrictions;
>
> (3) a description of the alternative measures considered that do not involve aircraft restrictions; and
>
> (4) a comparison of the costs and benefits of the alternative measures to the costs and benefits of the proposed restriction.

*Id.*  Pursuant to ANCA, the FAA has "promulgated a national aviation noise policy through 14 C.F.R. Part 161, the 'notice, review, and approval requirements," which 'apply to *all airports* imposing noise or access restrictions.'  *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 138 (2d Cir. 2016) (emphasis in original).

In *Friends of the East Hampton Airport*, the Town – the same defendant in this action – had attempted to impose three local laws restricting operations at HTO, namely, imposing certain curfews and weekly flight limits on various types of aircraft.  The plaintiffs, representing various aviation businesses that use HTO, sought an injunction prohibiting the Town enforcing the local laws, citing ANCA and the Town's failure to comply with ANCA's publication and pre-approval requirements.  The district court (Seybert, J.) granted the injunction only as to the weekly flight limit, holding that such a restriction was preempted by federal law and not subject to a very

---

[3] The FAA classifies aircraft into "Stages" based on their ability to operate below certain noise thresholds. Stage 1 aircraft are the loudest; Stage 2 aircraft are less noisy than Stage 1, Stage 3 less than Stage 2, and Stage 4, the quietest.

limited exception from preemption prescribed by the ADA. On appeal, the Second Circuit affirmed the injunction as to the flight limits, but also expanded the injunction to include the other two local laws concerning curfews. *Id.* at 136-376. The Court of Appeals found that ANCA applies to HTO, and that the Town was therefore required to follow ANCA's approval and publication requirements before imposing noise or access restrictions, which it had not. *Id.* at 148-150. Accordingly, the Court of Appeals held that ANCA preempted the local laws, that the plaintiffs were likely to succeed on the merits of their claims, and that all three of the Town's laws should be enjoined. *Id.* at 152.

The "No SVFR" Policy is on its very face an improper access restriction. FAA regulations define "noise or access restrictions" to include "any restrictions "affecting access or noise that affect the operations of Stage 2 or Stage 3 aircraft." 14 CFR § 161.5. As set forth above, the Policy effectively prevents Zip and most single engine helicopters from utilizing HTO at all. (*See* Shoshani Dec. ¶ 33.) It certainly prevents them from landing at HTO under weather conditions that the FAA itself has otherwise deemed safe for SVFR operations. (*See id.* ¶¶ 24, 33, 35.) Defendants did not seek FAA approval or unanimous consent before implementing the Policy, and did not publish the policy for public comment before imposing it on airport users.[4] The FAA itself agrees that the Policy amounts to an improper access restriction. (*See* Shoshani Dec., Ex. 5.)

ANCA clearly preempts the Town's "No SVFR" Policy. For this additional reason, Zip is likely to succeed on the merits, and the Court should enjoin further implementation of the Policy.

## IV. AN INJUNCTION WOULD SERVE THE PUBLIC INTEREST, AND WOULD BE EQUITABLE.

The balance of equities unquestionably favors an injunction in this case. An injunction

---

[4] To the extent Defendants were to argue that they are subject to any "local proprietor exception" because their Policy is somehow reasonable, nonarbitrary and nondiscriminatory, such an argument fails. Not only is it factually wrong, but the court cannot even consider the argument due to Defendants' lack of compliance with ANCA. *See Friends of the E. Hampton Airport*, 841 F.3d at 154.

now is the only way to ensure Zip will survive until the Court decides this case on its merits. Meanwhile, the Town will suffer no harm from such an injunction, which will merely preserve the preserve the status quo that has existed for decades, with HTO's control tower simply doing what the FAA requires of it: receiving, evaluating and then granting or denying SVFR clearance, as appropriate, on a case-by-case basis.

Granting an injunction also serves the public's interest. As is clear from the June 30 FAA Letter, the FAA does not support the "No SVFR" Policy, and believes it is counter to federal law. Given the FAA's pervasive and exclusive control over the field of aviation, and that the federal government is charged to act in the public interest, the Court should afford great weight to the FAA's view. *See Arapahoe*, 242 F.3d at 1220 (in arena of aviation regulation, "federal concerns are preeminent"). Further still, the public interest will be served "by enjoining the enforcement of the invalid [local policy]" while the Town, on the other hand, "does not have an interest in enforcing a [policy] that is likely constitutionally infirm." *See Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (citation omitted).

## **CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests that the Court grant its application for a temporary restraining order and preliminary injunction barring Defendants from enforcing their announced policy of refusing to grant any Special VFR clearances to aircraft taking off from or landing at East Hampton Airport, and grant such further relief as the Court deems just and proper.

Dated:  New York, New York
      July 22, 2021

                                    Respectfully submitted,

                                    DAVIS+GILBERT LLP

                                    By:  */s/ Joshua H. Epstein*
                                          Joshua H. Epstein
                                        David S. Greenberg
                                  1675 Broadway
                                  New York, New York 10019
                                  (212) 468-4800
                                  jepstein@dglaw.com
                                  dgreenberg@dglaw.com

                                  *Counsel for Plaintiff Zip Aviation, LLC*