BRIDGFORD, GLEASON & ARTINIAN
Richard K. Bridgford (CA SBN 119554)
Richard.Bridgford@Bridgfordlaw.com
Michael H. Artinian (CA SBN 203443)
Mike.Artinian@Bridgfordlaw.com
26 Corporate Plaza, Suite 250
Newport Beach, CA 92660
Telephone:   (949) 831-6611
Facsimile:   (949) 831-6622

COOLEY LLP
William V. O'Connor (CA SBN 216650)
woconnor@cooley.com
4401 Eastgate Mall
San Diego, CA  92121-1909
Telephone:  (858) 550-6000
Facsimile:  (858) 550-6420

COOLEY LLP
J. Parker Erkmann (*Pro hac vice* to be filed)
perkmann@cooley.com
1299 Pennsylvania Avenue, NW, Ste. 700
Washington, DC 20004-2400
Telephone:   (202) 776-2036
Facsimile:   (202) 842-7899

*Attorneys for Plaintiffs Delux Public Charter, LLC d/b/a
JSX Air and JetSuiteX, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC D/B/A JSX AIR AND JETSUITEX, INC., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ORANGE, CALIFORNIA, a charter county; BARRY RONDINELLA in his official capacity as Airport Director of John Wayne Airport, <br><br> Defendants. | No. <br><br> Hon. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **Demand for Jury Trial** |

## NATURE OF ACTION

1.      Since 2018, Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("JSX") (a small, highly-rated, on-demand air carrier) has provided innovative, safe, economical, and federally authorized air transportation services at John Wayne Airport ("JWA" or "Airport").  Plaintiff JetSuiteX, Inc. ("JetSuiteX") partners with JSX to offer a unique, convenient alternative to the large, well-funded air carriers (colloquially referred to as airlines) by (a) providing access to airports and cities not regularly serviced by the large airlines, and (b) providing customers with unique and convenient flying services the large airlines cannot offer customers—to wit, a Transportation Security Administration ("TSA")-approved and compliant security process that is superior and exceeds security that occurs in the main terminal.  JSX's check-in procedure presents customers with less hassle and requires customers to dedicate less time than is required at the main airport terminal and reduces their exposure to crowds, which protects them from life-threatening diseases such as COVID.   Plaintiffs' Federal Aviation Administration ("FAA"), TSA, and Department of Transportation ("DOT")-approved operation at non-TSA areas of the Airport has enabled Plaintiffs to offer the public access to lesser-served markets as well as access to a more convenient travel experience previously reserved for the small segment of the public flying on private jets.   JSX's superior service and expansion of access to underserved routes represents an evolution in air travel that is exactly what Congress intended when it deregulated the aviation industry and has been warmly embraced by the traveling public.

2.      However, the County of Orange ("County")—owner and operator of the Airport—recently imposed mandatory Airport lease terms with the specific discriminatory intent and effect of excluding Plaintiffs from providing their unique and popular air transportation services at JWA as of January 1, 2021.  Significantly, just two days before issuing termination letters to JSX, the Airport publicly

celebrated the commencement of operations of yet two more large airlines at the Airport's main terminal, involving far noisier, crowded operations:  Spirit Airlines and Allegiant Airlines.  JSX has much higher customer ratings than either of these large airlines.  And neither airline can provide the access and service to certain markets like Plaintiffs can—nor can they provide customers with the same crowd and hassle-free security procedure that JSX provides.  Spirit launched service to both Oakland and Las Vegas, which are both cities currently served by JSX; and Allegiant announced flights to Reno, another route which JSX serves.  In other words, Defendants discriminatorily chose to terminate JSX's access to the Airport in favor of two large airlines who plan to provide more of the same type of inconvenient, regularly scheduled service already available, while eliminating JSX's unique rates, routes, and services not otherwise available at the Airport (ostensibly to induce the new airlines' coming to JWA) by improperly discriminating against Plaintiffs and handing over to them Plaintiffs' hard-earned market share.

3.     Despite JSX's repeated requests for accommodation and presentation of at least five suitable ways to achieve it, the County has refused to grant JSX access to JWA beyond that date.  The County's conduct is unconstitutional for at least two reasons: (1) it is preempted by federal law; and (2) it violates Plaintiffs' right to equal protection under the law.  For both reasons, Plaintiffs seek declaratory and injunctive relief to ensure that they will be able to provide air transportation services at the Airport.

4.     Defendant Barry Rondinella is the Airport Director of JWA. Mr. Rondinella is an agent and employee of the County who, within the scope of his duties and acting under the color of state law, negotiates and enforces lease terms at the Airport.  Mr. Rondinella terminated JSX's ability to operate at JWA in a written letter received on November 19, 2020.

5.     Plaintiff JSX is a federally licensed air carrier that complies with all

applicable laws and regulations.  JSX operates 30-seat aircraft and has never had a safety incident or accident.  According to third party customer satisfaction surveys, JSX is currently the highest rated air carrier in the country.

6.      Plaintiff JetSuiteX is a federally licensed "indirect air carrier" who partners with JSX to market commercial air carrier services.  JetSuiteX complies with all applicable laws and regulations.

7.      JSX has been operating out of JWA, safely and fully compliant with all applicable laws, since June 2018.  There have been no safety issues with JSX's operations at JWA.

8.      Nevertheless, in November 2020, the County mandated lease terms that impose an unconstitutional, discriminatory restriction upon airport users, including JSX (the "Restriction").   Under the Restriction, JSX will be prohibited from operating at JWA as of January 1, 2021.

9.      The County drafted and approved the Restriction with the specific intent of prohibiting JSX from operating at JWA.  The County has not provided a reason for its discriminatory policy and instead has acknowledged, several times to several different people, that its sole purpose of passing the Restriction was to prevent JSX from continuing operations at JWA.

10.     The Restriction prevents JSX from offering diverse and underserved routes and services that are fully authorized by federal law.  The Restriction also discriminates against JSX.  The Restriction is thus unconstitutional because it is both preempted by the Constitution's Supremacy Clause and, separately, violates the Fourteenth Amendment's Equal Protection Clause.

11.     On December 10, 2020, the agenda for the County's December 15, 2020 meeting was released.  This is the final public meeting of the year and the last opportunity for the County to ameliorate its access restriction and lack of accommodation for JSX.  JSX expected to be included on the public meeting agenda

and that the County would address the constitutional violation. Instead, JSX was not on the agenda and thus it became clear that the only way JSX could protect its rights was through this action.

12.    Accordingly, JSX and JetSuiteX seek injunctive and declaratory relief in order to prevent the County, its agents, employees, or anyone acting on its behalf, from unlawfully prohibiting it from accessing JWA on fair, non-discriminatory, and reasonable terms. Defendants have not only imposed a discriminatory restriction, but both before and after doing so Defendants refused to provide a fair and reasonable accommodation to permit JSX and JetSuiteX to continue their operations at JWA, in violation of federal law. The Restriction, and JWA's refusal to provide any reasonable accommodation as required by law, has and will cause irreparable injury to JSX and JetSuiteX. JSX and JetSuiteX seek a return to the *status quo ante*—a safe, accessible, and mutually beneficial arrangement that has been in place for over two years—and to ensure that the County does not try to prohibit it from accessing JWA on fair and non-discriminatory terms moving forward.

## PARTIES

**Plaintiffs**

13.    **Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("JSX")** is a Delaware limited liability company with its administrative offices located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas. JSX is an FAA-certificated, on-demand air carrier that operates commercial flights pursuant to 14 C.F.R. § 135 and holds a Commuter Air Carrier Authority issued by the DOT. JSX's operations are safe, legal, quieter than any other commercial operator at JWA, and offer the traveling public a unique alternative to the traditional air carriers. Indeed, due to JSX's ability to facilitate a fast, terminal-free, and socially distanced boarding and travel experience, customers are able to travel with confidence even during the pandemic. JSX has an impeccable safety record and is fully compliant with all

applicable federal, state, and local laws.

14.     **Plaintiff JetSuiteX, Inc. ("JetSuiteX")** is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas.  JetSuiteX is the parent corporation of JSX.  JetSuiteX is an indirect air carrier that sells tickets for JSX flights pursuant to authority granted by the DOT.  JetSuiteX is fully compliant with all applicable federal, state, and local legal obligations.

**Defendants**

15.     **Defendant County of Orange, California ("County")**, is a charter county located in the Central District of California, with capacity to sue and be sued. The County is the owner and operator of the Airport.  The Airport, a division of the County, is a commercial and general aviation airport located at 18601 Airport Way, Santa Ana, California, within the Central District of California.  The Airport is the only commercial service airport in the County and the primary provider of general aviation services and facilities in the County.[1]  The County receives federal grant money to operate the Airport and, as a result, is obligated by the Grant Assurances and federal statutes to operate in a reasonable, non-discriminatory, and financially self-sustaining manner.   The County operates and maintains the Airport as a governmental function for the primary purpose of providing air transportation to the public.  The County is managed by five elected officials who make up the Orange County Board of Supervisors ("Board").   The Board, and each of its individual members, are representatives, agents, and employees of the County and the scope of their duties includes, among other things, approving and enforcing lease terms at the Airport.  The County is a person within the meaning of 42 U.S.C. § 1983.

16.     **Defendant Barry Rondinella ("Mr. Rondinella"; collectively with**

---

[1] https://www.ocair.com/aboutjwa/

**County, "Defendants")** is named in his official capacity as the Airport Director of JWA. At all times relevant to this complaint, Mr. Rondinella was an agent and employee of the County who was responsible for developing airport policies, administering all activities associated with the operation of a medium hub commercial airport, and had direct responsibility for five airport divisions: Business Development, Facilities, Finance and Administration, Operations, and Public Affairs. Mr. Rondinella reports to the County and is responsible for carrying out policies, procedures, and duties regarding the Airport authorized by the Board. Pertinent here, within the scope of his duties, Mr. Rondinella is charged with enforcing the Restriction and in fact has already informed JSX that it is prohibited from operating at JWA as of January 1, 2021. Mr. Rondinella and his staff have acknowledged that the Restriction was intentionally drafted and approved to eliminate JSX from the Airport. Mr. Rondinella is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this Complaint. Mr. Rondinella's official residence is at JWA, which is located in Orange County, California, within the Central District of California.

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction over the subject matter of this action pursuant to (1) 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States; (2) because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution; and (3) this Court's inherent jurisdiction to grant equitable relief for violations of the United States Constitution.

18.     This Court has personal jurisdiction over Defendants because they are domiciled in, reside in, or are a county located in California and because their denial of JSX's rights under the United States Constitution and the laws of the United States occurred within California. The injuries caused by each Defendant occurred

in California.

19.    Venue is proper in the Southern Division of the Central District of California because Defendants reside in the District and because a substantial part of the events or omissions giving rise to the claims occurred in the District.

20.    This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

21.    This Court also has authority to enter injunctive relief for Defendants' violation of federal law and the United States Constitution through equity jurisdiction authorized by *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny.

## STATEMENT OF FACTS

### JSX Is Federally Authorized And Indisputably Safe

22.    JSX is an FAA-certificated air carrier that is authorized by federal law to fly customers for compensation or hire under the FAA's operating rules contained in 14 C.F.R. § 135 ("Part 135").  JSX also holds a commuter air carrier authorization issued by the DOT.

23.    JSX has been operating at JWA since June 2018.  JSX has never had a safety incident or accident at JWA or elsewhere in its five-year operating history.

24.    JWA is one of JSX's largest markets.  At various times since 2018, JSX has flown (or is scheduled to fly) routes that connect the following cities from its operations at JWA:  Las Vegas, Oakland, Phoenix, Reno, Mammoth Lakes, Napa, Concord, and Palm Springs.  On some routes, such as Oakland and Las Vegas, JSX competes with the services of large airlines.  On other routes, such as Reno, Concord, and seasonal flights to Mammoth and Thermal, JSX offers the only nonstop service.

25.    Currently, JSX's operation at JWA directly employs more than 50 individuals who live in or near the County.  Hundreds of additional jobs are

supported indirectly.  JSX has paid over $13.2 million to operate at JWA, including $8.8 million in rent, fuel, passenger facility charges, landing, and other fees paid at the Airport.  JSX estimates that the local economic impact of its flight operations is $25 million annually.

26.     JSX's operations are fully compliant with federal law, but they are structured differently than the large scheduled airlines that operate at JWA.  JSX's departure times, departure locations, and arrival locations are specifically negotiated with its sole customer, JetSuiteX.  JetSuiteX is an indirect air carrier that has authority from the DOT under 14 C.F.R. § 380 to sell individual seats to the public on the flights it organizes on JSX.[2]

27.     The most unique aspect of JSX's operations is that its customers do not have to enter the terminal of an airport to board or deplane:  the result is a fast, crowd-free airport experience.

28.     JSX's federally approved certification status and its Transportation Safety Administration ("TSA") approved "Twelve-Five" Security Plan[3] (which is superior to and in many ways exceeds the standard TSA plan utilized in the main terminal) and business model require it to drop-off and pick-up customers at locations within the Airport that are *not* Security Identification Display Areas ("SIDA").  A SIDA location is differentiated and cordoned off from non-SIDA locations at the Airport—but both types of security checkpoints are TSA-approved and meet federal regulations.

29.     Customers of large airlines who board from terminal buildings are

---

[2] Under this federally authorized arrangement, JetSuiteX sells tickets to the traveling public, JetSuiteX charters an entire JSX flight, and then JSX operates the flight using the time, location, and destination designated by JetSuiteX.

[3] The "Twelve Five" Security Plan refers to a category of TSA-approved security plan applicable to the operation of certain aircraft with a maximum certificated takeoff weight of 12,500 pounds or more.  *See* 49 C.F.R. § 1550.7.

required to pass through a TSA security checkpoint in order to enter the terminal (which is a SIDA location) at JWA. The TSA security checkpoints—and the crowds, frustration, and delays associated with them—are ubiquitous for the average airport user.

30.     But JSX is different. JSX operates pursuant to a federally authorized regulatory protocol that permits its customers to bypass normal TSA security checkpoints; bypass large crowds and long lines; and bypass the typical time spent waiting for an airplane to board and depart. JSX is both faster and safer. JSX maintains a rigorous TSA-approved and monitored security plan, but it does not process customers through the main terminal's TSA checkpoints.

31.     Unlike the major scheduled air carriers, JSX operates 30-seat aircraft and offers a type of service that FAA regulations classify as "on-demand" services. *See* 14 C.F.R. Part 110.2 (defining "on demand" operations). Under applicable regulations and its TSA-approved security plan, JSX can operate (and has for several years incident free, at every one of its airports) from non-SIDA portions of JWA, such as a fixed base operator ("FBO") (discussed *infra*).

32.     Put another way, JSX can legally and safely permit its customers to board and deplane *without* the need to pass through a TSA-security checkpoint. Importantly, JSX cannot legally permit its customers to enter SIDA areas of JWA because non-SIDA and SIDA customers cannot commingle under the regulations. As a result, JSX's customers are federally *prohibited* from entering the main terminal at JWA. In other words, the County's Restriction (which would force all JSX customers through the SIDA main terminal) would eliminate JSX's ability to operate under its otherwise fully FAA-compliant procedures.

33.     Moreover, even if JSX wanted to introduce a requirement that its customers pass through a SIDA-compliant security checkpoint at JWA in the main terminal, by law it would be unable to do so. This is true because several of the

airports that JSX operates out of for routes that link to JWA, such as Buchanan Field Airport in Concord, California, do not have a TSA-checkpoint.  As a result, JSX cannot fly out of Concord to JWA and introduce its customers into the SIDA portion of the airport.  Similarly, the JSX flights operating from airports with TSA checkpoints, such as McCarran International Airport in Las Vegas, Nevada, originate from non-SIDA locations that lack TSA facilities.  Hence, the Restriction requiring JWA customers to funnel through the main SIDA terminal at JWA thereby operates to improperly regulate the preempted field of aviation by eliminating "access" to JWA on those routes, thus effectively eliminating those routes and services, which are beneficial to the public.

34.    To be sure, JSX has adopted and implemented security protocols that *exceed* TSA requirements, but it screens and boards its customers (approximately 30 per flight) much more rapidly than the larger air carriers who process hundreds of customers per flight and are required to operate from the SIDA portions of the terminal (including the TSA checkpoints).  JSX thus provides its customers with a much more rapid, socially distanced way to board and travel:  no large groups waiting to pass through security; no large groups waiting to board; and no large groups waiting to retrieve baggage.  *At the height of a global pandemic, this is the worst time to eliminate JSX's services that benefit the public – including immunocompromised customers who are fearful of greater risk and exposure to infection at the main terminal.*

35.    Because JSX's non-SIDA (but TSA approved) security protocol can never be mixed with the SIDA security protocol employed at the main terminal, JSX's customers are not required to pass through TSA-security checkpoints. Instead, these customers are required, by federal law, to utilize non-SIDA locations at the Airport.

36.    But this is not problematic and, instead, is one of the most attractive

aspects of JSX's business model.  Entirely consistent with federal law, JSX's customers can arrive 20 minutes before a flight, pass through JSX's TSA-compliant and approved security procedures at the FBO, and avoid long lines and large crowds.  This is only possible if JSX is able to utilize a non-SIDA location at an airport for boarding and deplaning.  Defendants know this.  However, Defendants have refused to provide a reasonable accommodation to permit JSX and JetSuiteX to continue their operations at JWA through a non-SIDA location, in violation of federal law.

37.    Because of this and other customer-centric efforts, JSX is the highest rated air carrier in North America, and the attractiveness of its service has only grown during the pandemic.  As stated in a recent Forbes article about JSX:

> The JSX Simpli-Fly program is centered around the current needs of the Covid traveler, including:  increased aircraft and lounge sterilization throughout the day, maintaining only 30-[customers] onboard per flight, 2x1 seating configuration with a minimum of 36-inch pitch and no middle seats or overhead bins and an advanced air circulation system that combines a significantly higher percentage of fresh versus recycled air while creating "mass flow balance," which means each section of the cabin has its own air induction and removal stream.[4]

38.    JSX has operated for five years, enjoys a perfect safety record, the highest customer satisfaction of any air carrier in the United States and was named #1 air carrier in North America by APEX, the Airline Passenger Experience Association.

39.    By contrast, Spirit (which was welcomed to JWA on November 17, 2020, just two days before the County prohibited JSX from accessing JWA on November 19, 2020), has received some of the lowest ratings.  For example, a recent Forbes article on airline ratings during COVID stated:

---

[4] https://www.forbes.com/sites/jqlouise/2020/10/27/how-these-brands-are-making-traveling-during-covid-19-easier/?sh=309912371630

> At the bottom of the list is Spirit Airlines, which receives the lowest ranking of the 10 major American carriers. The low-cost airline ranks poorly due to additional charges for masks, vague cleaning procedures and no efforts to limit flight capacity or protect frequent flyers.[5]

40.     With more space between seats and a low hassle airport experience (e.g., no security lines, no waiting at the gates, and no showing up hours early to board a flight), thousands of customers have told JSX that it is the *only* carrier they will fly until the pandemic subsides.  To that end, more than 5,500 customers have contacted the County to voice their opposition to the Restriction.  Among these displeased County residents are many immunocompromised individuals who need to travel for medical treatment; medical professionals engaged in fighting the pandemic; and first responders who enable California to manage emergencies including the pandemic and forest fires.

41.     JSX's customer-preferred, critical transportation services have been designated as "Essential" by DOT, the Department of Homeland Security ("DHS") and Cybersecurity & Infrastructure Security Agency ("CISA").

42.     Moreover, JSX is the most "neighborly" commercial air carrier at JWA.  Studies have shown that JSX operates the quietest commercial aircraft serving JWA, and JSX has worked with JWA and the FAA to implement flight procedures that minimize the negative impacts of noise on the neighboring communities.

43.     A 2019 noise study at JWA empirically demonstrated that a single Boeing 737-800—an aircraft commonly used by large airlines—produces the same amount of noise as *thirty-eight* JSX overflights.  The community's concern about aircraft noise is real, and JSX has taken affirmative steps to address the issue.

---

[5] https://www.forbes.com/sites/laurabegleybloom/2020/07/27/covid-report-best-worst-airlines-coronavirus/?sh=6810a24913af

44.    Simply put, JSX provides a level of safety, convenience, and socially distanced flying experience that is otherwise only available to individuals who can afford to travel in a private jet.  JSX's services are safe, federally authorized, and especially well-suited for individuals who travel during the pandemic.

**JSX Has Safely Operated At JWA Since 2018**

45.    JWA is a "public use" Airport that is funded, in part, by grants obtained under one or more federal programs, including the Airport Improvement Program. The receipt of federal grant money obligates the County to comply with statutorily enumerated obligations, known as "Grant Assurances."

46.    If an airport is obligated to comply with the Grant Assurances, the FAA has made clear that "Federally obligated airport sponsors are required to operate airports for the use and benefit of aeronautical users and to make those airports available to *all types, kinds, and classes* of aeronautical activities on fair and reasonable terms, and *without unjust discrimination*." (emphasis added).[6]  In other words, JWA has a duty to make "reasonable accommodations" to JSX.

47.    Pertinent here, the Grant Assurances, as set forth in federal statute, require the County to provide access to all aviation users in a reasonable and non-discriminatory manner.  At minimum, this means that the County cannot arbitrarily seek to exclude an airport user (e.g., an air carrier) from accessing the Airport.[7]

48.    Federal law also prohibits JWA from creating rules or policies that have the effect of restricting an airport user's access to the Airport.  The Restriction and the refusal to make any reasonable accommodation (if permitted) is a rule that has

---

[6] https://www.faa.gov/airports/airport_compliance/media/airportSponsor AndUserRightsBrochure.pdf

[7] JSX is required to pursue an administrative remedy for violation of the Grant Assurances through a "Part 16" complaint process filed with the FAA. *See* 14 C.F.R. § 16.1 *et seq*.  However, the FAA does not have jurisdiction to resolve the claims raised in this Complaint and thus parallel proceedings are required.

such an effect, preventing JSX's access to JWA.

49.     In June 2018, JWA issued JSX a license to operate from a non-SIDA location – namely, an FBO located at the Airport.  An FBO is an aeronautical service provider located at an airport who, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators.  FBOs typically lease premises from the airport sponsor and are obligated to comply with the Grant Assurances, including the requirement that they offer services in a fair, reasonable, and non-discriminatory manner.  An FBO's lease typically must be approved by the airport sponsor, and the airport sponsor has the ability to require an FBO to include certain terms in its lease.

50.     Under the license, JSX began operating from Aviation Consultants, Inc. d/b/a ACI Jet ("ACI Jet").  ACI Jet is a large, well-respected FBO at JWA.  Under this license agreement, JSX would rent space and purchase fuel from ACI Jet.  In return, ACI Jet would provide a location for JSX's customers to board and deplane JSX flights.

51.     The lease currently in effect between ACI Jet and the County does not contain any terms prohibiting JSX's operations from ACI Jet's FBO facility.

52.     However, due to the Restriction imposed by the County and the refusal to make any reasonable accommodation (discussed *infra*), ACI Jet has terminated JSX's ability to operate out of its FBO facility at JWA as of January 1, 2021.

53.     Indeed, as of the date of this Complaint, JSX still operates from ACI Jet's FBO facility and both parties are willing to continue the license agreement into the future.  ACI Jet publicly confirmed its support for JSX's continued operations at JWA during the Board's meeting held on September 15, 2020.  The *only* reason that ACI Jet has indicated that it will terminate JSX's lease is because of the Restriction the County has mandated to be included in ACI Jet's new lease.  But for the County's discriminatory Restriction, JSX could continue its operations at ACI

Jet's facility.

**The Restriction Specifically and Intentionally Targets JSX**

54.     Since the outset of its operations at JWA, JSX has been utilizing FBOs—such as ACI Jet—or its own leaseholds for its customer drop-off and pick-up services.

55.     In the summer of 2020, the County authorized Mr. Rondinella to begin negotiating new FBO leases, including with ACI Jet and another FBO named Clay Lacy Aviation, Inc.

56.     If the FBO could not secure a new lease with the Airport, it would be forced to stop operations at JWA.

57.     Mr. Rondinella instructed bidders for the FBO leases, including ACI Jet, that they must agree to lease terms that were intentionally drafted to restrict JSX's access to JWA.

58.     The County and Mr. Rondinella's intent and purpose was to ban JSX from operating routes or providing services out of JWA.  This same sentiment was conveyed directly to JSX.  On September 11, 2020 (four days before the new leases were approved), Mr. Rondinella spoke with JSX's Chief Executive Officer Alex Wilcox.  During this conversation, Mr. Rondinella advised Mr. Wilcox that the Restriction was both required and *intended to prohibit JSX from operating at JWA.*

59.     To that end, if the FBO would not agree to prohibit JSX from using its facilities, their bid for a renewed lease would not be considered.  During summer 2020, Mr. Rondinella spoke with the majority owner of ACI Jet regarding ACI Jet's lease renewal.  On information and belief, Mr. Rondinella told ACI Jet's majority owner that ACI Jet would not be awarded a renewed lease unless it stopped JSX from operating at ACI Jet.

60.     Prior to formally agreeing to Defendants' proposed Restrictions, ACI Jet attempted to negotiate terms that would allow JSX to continue to operate routes

and provide services from JWA, but Defendants were insistent that JSX be denied access to JWA.    Defendants have failed to provide JSX a reasonable accommodation to permit its continued operations at JWA, in violation of federal law.  Moreover, Defendants would not permit ACI Jet to offer JSX a transition period.

61.    ACI Jet ultimately agreed, at the County's behest, to restrict JSX's access to JWA in order that its bid proposal would be considered by the County.

62.    Accordingly, at its September 15, 2020, meeting, the County approved new leases between the County and two FBOs:  ACI Jet and Clay Lacy Aviation, Inc. (the "Leases").  As a result, the Leases contain the Restriction that prohibits JSX's operations from the FBOs as of January 1, 2021.

63.    The Leases—which only apply to the FBOs from which JSX currently operates—contain the Restriction that prohibits the FBOs from facilitating customer pick-up or drop-off from "Regularly Scheduled Commercial Operators" as defined in the Access Plan[8]:

> **LESSEE shall not permit the operation of a Regularly Scheduled Commercial User as defined in section 2.40 of John Wayne Airport's Phase 2 Commercial Airline Access Plan and Regulation, as may be amended from time to time.**[9]

64.    To be sure, the County did not expressly name JSX in the resolution it passed that introduced new, mandatory language in the FBO Leases.  But it intentionally drafted the Restriction for the sole and intentional purpose of making it *impossible* for JSX—and only JSX—to operate at JWA.  The County's Restriction

---

[8] The Access Plan governs operations at JWA and is a byproduct of the 1985 Settlement Agreement.

[9] Orange County Board of Supervisors, Agenda Revisions and Supplementals (Sep. 15, 2020), Attachment A at 24; Attachment B at 24 (https://board.ocgov.com/sites/bos.egovoc.com/files/2020-09/rev-sup09152020.pdf.

bars JSX from accessing JWA because of its FAA-authorized operations in and out of other non-SIDA terminals—the crux of JSX's operations and business model that enables JSX to compete with traditional airlines.

65.     The Access Plan classifies JSX as a "Regularly Scheduled Commercial User."[10]  This is the same category that applies to the large, regularly scheduled carriers, such as Southwest or Delta.  However, because the scheduled carriers are federally required to operate from the SIDA portions of the terminal—a byproduct of the FAA certification status that the major carriers have, set forth in 14 C.F.R. § 121 ("Part 121")—the Restriction applies uniquely to JSX.

66.     The regulatory distinction between the large airlines and JSX is key to understanding the subtle but intentional discrimination inherent in the Restriction, which prevents JSX from accessing JWA.  The major carriers who operate under Part 121 *never* operated out of the FBOs, have *always* operated out of the terminal, and are *federally prohibited* from utilizing the FBOs.

67.     Therefore, by drafting the Leases (which apply only to the FBOs) in this manner, the County and Mr. Rondinella intentionally targeted the only "Regularly Scheduled Commercial User" that had operated out of the FBOs— JSX—from continuing to operate out of the FBOs.  In so doing, Defendants knew

---

[10] The term "Regularly Scheduled Commercial User" defined and used in the Access Plan does not correspond to any term or classification used in the Federal Aviation Regulation.  Instead, under JWA's Access Plan § 2.40, a "Regularly Scheduled Commercial User" means "any person conducting aircraft operations at JWA for the purpose of carrying passengers, freight, or cargo where such operations: (i) are operated in support of, advertised, or otherwise made available to members of the public by any means for commercial air transportation purposes, and members of the public may travel or ship Commercial Cargo on the flights; (ii) the flights are scheduled to occur, or are represented as occurring (or available) at specified times and days; and (iii) the person conducts, or proposes to operate, departures at JWA at a frequency greater than two (2) times per week during any consecutive three (3) week period."

they were making it *impossible* for JSX to continue operating out of JWA. The Restriction was intentionally added to the Leases to eliminate JSX—a small and innovative air carrier with a popular model—to eliminate competition for the large airlines at JWA. And at the same time, JWA welcomed Spirit and Allegiant that fail to provide the public with the same unique services JSX provides.

68.     The Restriction does not prohibit the operations of any other on-demand air carrier. Indeed, if a non-JSX aircraft operating under the same federal authority and utilizing the same aircraft as JSX arrived at JWA, it would be permitted to pick-up and drop-off its customers at the FBOs. JSX is the *only* operator prohibited from accessing the FBOs at JWA as a result of the Restriction.

69.     The Restriction and the refusal to make any reasonable accommodation has the impact of restricting JSX's access to JWA and prohibiting JSX's routes and service from JWA. As noted, JSX cannot simply begin utilizing the terminal (which is a SIDA location) because, among other reasons, it flies routes that connect JWA to airports that lack TSA-staffed facilities, such as Buchanan Field in Concord, California. Flights from Concord (as an example) cannot deplane at JWA's SIDA-compliant terminal. Therefore, all routes and services from Concord have been eliminated by the Restriction.

70.     To date, Defendants have not provided any basis, justification, or reason for adding the Restriction in the Leases.

71.     Instead, Mr. Rondinella has acknowledged that the Restriction intentionally singled out JSX and was required for the sole purpose of eliminating JSX's ability to operate at the Airport.

72.     Despite there being no incidents, accidents, or other safety issues for the two-plus years that JSX operated out of ACI Jet, or the five years JSX has operated nation-wide, the County banned JSX's operations.

**JWA Refuses To Provide Reasonable Accommodations To JSX**

73.    With the Restriction, Defendants have completely restricted JSX's access to the Airport.  Furthermore, despite JSX's good faith and best efforts, JWA has denied all requests for accommodation.  Far from providing a "reasonable accommodation" to JSX—as JWA is required to do under federal law and its Grant Assurances—the Airport has failed to provide any accommodation at all.

74.    Seeking to find a reasonable accommodation that would be acceptable to the County, JSX proposed several viable alternatives to the County and Mr. Rondinella for JSX to operate at the Airport.  JSX has written and told this to the County and Mr. Rondinella several times, but every potential accommodation presented by JSX was denied or ignored.

75.    During the September 11 conversation between JSX's Mr. Wilcox and Mr. Rondinella, Mr. Wilcox advised Mr. Rondinella that the Restriction (that had been proposed but not yet approved) would deny JSX access to the ACI Jet facility and asked that JSX be accommodated at another location at the Airport.

76.    To try and find a way to accommodate its services at JWA, Mr. Wilcox renewed a request that JSX has previously made that JWA convert an under-utilized portion of the terminal or terminal ramp and parking area into a non-SIDA area to accommodate JSX's operation.  This request was summarily denied.

77.    JSX also offered, again, to operate out of a number of unused buildings at JWA, convert space to be compliant with its non-SIDA operations, or bus its customers from the FBO to a different loading area for customer pick-up and drop-off.  These reasonable accommodations were also denied.

78.    In addition, JSX proposed to operate consistent with the charter services operated on behalf of sports teams where an air carrier buses its customers from an off-Airport location (e.g., a hotel) to its aircraft on the terminal ramp or at an FBO.  This reasonable accommodation was also denied.

79.    JSX was (and remains) willing and able to do anything that would

permit it to retain access to the Airport.  Defendants ignored or rejected these proposed accommodations.

80.    Indeed, Mr. Rondinella and the Airport have repeatedly refused to make any accommodation that would allow JSX to continue to operate at JWA consistent with its TSA-approved security plan and FAA-approved operating authority.

81.    The County's and Mr. Rondinella's refusal was intended to and has denied JSX access to the Airport.  In doing so, the Airport has failed to fulfill the legal obligations it undertakes as a public use airport that receives federal funds, including a commitment "to make [the] airport[] available as an airport for public use on reasonable terms and without unjust discrimination to *all types, kinds and classes* of aeronautical activities, *including commercial aeronautical activities offering services to the public at the airport*."

82.    On November 19, 2020, the County issued two letters to JSX.  In the letters, the County refused to offer any accommodation (notwithstanding the prior discussions) and terminated JSX's authority to operate as a commuter air carrier from the FBO as of January 1, 2021.

83.    To be sure, the termination letter purports to grant JSX the ability to operate out of the SIDA terminal for 2021.  But the County knows that this is federally prohibited (because JSX flies from non-SIDA sites) and thus it intentionally proposed a false option to JSX by forcing its customers through the SIDA main terminal.

84.    Again, JSX is unable to utilize SIDA locations (such as the main terminal) to deplane (as an example) because none of its customers have passed through TSA-checkpoints and, in some cases, are coming from airports that do not have SIDA locations at all, such as Concord, California.

85.    The County's "option" for 2021 set forth in the letter is no option at

all.

86.    On December 10, 2020, the agenda for the County's December 15, 2020 meeting was released.  This is the final public meeting of the year and the last opportunity for the County to ameliorate its access restriction and lack of accommodation for JSX.  JSX expected to be included on the public meeting agenda and that the County would address the constitutional violation.  Instead, JSX was not on the agenda and thus it became clear that the only way JSX could protect its rights was through this action.

87.    The County's decision has the effect of restricting JSX's access to the Airport and ending JSX's services and routes through the FBO at JWA as of January 1, 2021.

**JWA Acts In Bad Faith**

88.    Despite the County's and Mr. Rondinella's intention to ban JSX from the Airport, JSX was offered several assurances that it would be able to operate in 2021, *even after the Leases were approved*.

89.    Around the same time that the County was considering and ultimately approved the new Restriction, JSX reached out to the Orange County traveling public and asked them to write to the Board if they opposed the Restriction that the Board was considering.  The public responded with more than 5,500 emails to the Board in the ensuing 48 hours.  These emails came from County residents and national travelers who opposed the Restriction that banned JSX from operating routes and services out of JWA.

90.    Perhaps in reaction to the public outcry, or perhaps recognizing that the Restriction is invalid under federal law and its own Access Plan, the County requested that JSX *not* pursue legal remedies *and wait for resolution until after the election* as it was prepared to offer an "olive branch" to provide JSX with the ability to continue operating out of JWA consistent with JSX's business model and federal

law.

91.    Acting in good faith, JSX complied with the County's request that it not seek legal redress for this violation and waited to hear the County's proposed path forward.  JSX was optimistic that the County would remedy its constitutional violation and provide a reasonable accommodation as it is required to do under federal law prior to January 1, 2021.

92.    Based on these assurances from the County, and in reliance upon them, and the availability of numerous options for JWA to accommodate JSX, JSX continued and continues to sell tickets to customers for flights departing to or arriving at JWA after January 1, 2021; schedule new routes that incorporate JWA in the city-pairing after January 1, 2021; enter into agreements to service new cities from JWA after January 1, 2021; and market its services to the people who fly into or out of Orange County.

93.    For example, on September 21, 2020, the County suggested that JSX would be permitted to operate from the ACI Jet terminal for another year (e.g., for all of 2021).  This would allow JSX to continue to operate as it always has for another year, and to plan for alternative accommodations at JWA during that time.

94.    On September 25, 2020, JWA officials met with JSX to discuss possible customer and related operational alternatives proposed by JSX, including the following:

A.    Operate out of the U.S. Customs and Border Protection ("USCBP") Federal Inspection Service ("FIS") area when it is not in use by USCBP;

B.    Operate from a gate at the main terminal that is underutilized and construct a corridor in order to provide a non-SIDA area for customers to enter and exit the Airport for boarding;

C.    Operate in a manner consistent with sport team charter operations at the Airport and are permitted to use non-SIDA areas of the Airport for boarding and deplaning;

D.    Remain at the current FBO lobby location at ACI Jet and

                 escort customers to the underutilized gate for loading; or

E.     Continue to operate out of ACI Jet in a manner consistent with current JSX operations.

95. Following this meeting, JWA and County officials communicated to JSX that a firm proposal—the aforementioned "olive branch"—would be forthcoming, *but not until after the election in early November*.

96. Despite these assurances, the County did not offer any accommodation to JSX and appears to have been acting in bad faith. Instead, the County summarily denied any of the accommodations that had been proposed and discussed.

97. The promised "olive branch" was not the only reason that JSX believed, in good faith, that the County would ameliorate its constitutional violation and afford JSX an accommodation.

98. Due to a 1985 Settlement Agreement entered into by and between the County and the Board, the City of Newport Beach, public interest groups, and a working group of airlines, JWA has annual capacity limitations on the number of customers that can utilize the Airport.[11] The Settlement Agreement has been modified and the customer capacity limits have increased several times since 1985. *See County of Orange v. Air California, Inc.*, No. CV 85-1542 (Dec. 13, 1985), as amended.

99. To comply with the Settlement Agreement but also maximize the number of customers who can use the Airport, the County has instituted a process in which air carriers may request a certain allocation of capacity for the upcoming year. Since 2018, JSX has been afforded an annual capacity with the County's full knowledge that its operations are out of ACI Jet's FBO facility.

100. In parallel with the Lease negotiations, the County engaged in its annual process for allocating capacity under the Access Plan. On August 19, 2020,

[11] Some operations do not require an allocation, such as general aviation flights.

in a letter from Mr. Rondinella, JWA invited JSX and other commuter air carriers to request customer allocations for 2021.

101.   On September 11, 2020 (four days before the Leases were approved), JSX submitted its timely request for an allocation of 95,070 customers for 2021. This is the same number of customers that JSX had requested, and JWA had approved, for 2020.

102.   Just two weeks before Mr. Rondinella announced commencement of services by Spirit and Allegiant, Mr. Rondinella recommended that the County approve JSX's complete 2021 allocation request at the November 3, 2020, Board meeting.  This suggested that the Airport was expecting JSX to continue operating at JWA, which could only occur if an accommodation was made that did not require JSX to operate out of a SIDA portion of the terminal.

103.   For both reasons—the express "olive branch" statement by the County as well as the implicit recognition that JSX would need customer allocation for 2021 only if it was allowed to operate at JWA—JSX took the County at its word and tried to find a non-litigious solution.

104.   But the County and Mr. Rondinella apparently had no intention of finding such a solution.  Instead, on November 17, 2020, JWA welcomed large airlines Spirit and Allegiant in a well-publicized announcement; and 48 hours later, on November 19, 2020, JWA terminated JSX's services from the FBO run by ACI Jet.  The bad faith with which they operated has now forced JSX to seek emergency relief due to the Restriction becoming effective as of January 1, 2021.

**JSX Needs Declaratory And Injunctive Relief To Avoid Irreparable Harm**

105.   Defendants intentionally targeted JSX's operations for elimination and therefore approved the Restriction with the intention of excluding JSX from JWA.

106.   County officials have admitted that the intent of the Restriction was to eliminate JSX.

107.   On information and belief, the County was motivated to prohibit JSX from operating at JWA to favor the more politically powerful large airlines.

108.   For example, on November 17, 2020, and two days prior to issuing the letters terminating JSX's authority to operate at JWA, Spirit announced that it would begin service from JWA to both Oakland and Las Vegas, which are both cities currently served by JSX.   The Airport held a ceremony to celebrate the commencement of Spirit's operations at the Airport:

**SPIRIT JETS OFF FROM ORANGE COUNTY TO OAKLAND AND LAS VEGAS[12]**



**Spirit began Orange County to Oakland and Las Vegas on 17 and 18 November respectively. Phoenix is coming in January.**

109.   On the same day, the Airport also announced that it would be welcoming Allegiant to begin operating out of JWA—including flights to Reno, another route which JSX services.  If the County's illegal action is allowed to stand,

---

[12] https://www.anna.aero/2020/11/20/spirit-jets-off-from-orange-county-to-oakland-and-las-vegas/

the Airport will have succeeded in eliminating one of three competitors on the JWA-Oakland route and one of four competitors on the JWA-Las Vegas route—all to the benefit of the large airlines serving those routes.  This is just an example of the Airport's discriminatory actions taken to favor Part 121 airlines at the expense of JSX.

110.   As a result of Defendants' unlawful conduct, and in the absence of injunctive relief, JSX will suffer an irreparable blow to its business model, substantial loss of business, will be put at a significant competitive disadvantage, will suffer harm to its business reputation and damage to its goodwill, its JWA-based employees will be harmed, and its constitutional rights will be violated.

111.   JSX is already suffering many of these irreparable harms as it has already sold tickets for flights arriving at or departing from JWA in 2021 based on assurances from Defendants; has entered into agreements to fly routes that connect other cities to JWA; and has spent a significant amount of time and resources marketing to the traveling public who fly to or from JWA.

112.   JSX is not the only party negatively affected by the County's illegal Restriction.  A significant segment of the traveling public has spoken loudly and clearly that it prefers to travel on JSX as compared to alternative, more crowded modes of transportation.  More than 5,500 travelers affirmatively contacted the Board as a result of the illegal Restriction and dozens appeared at the Board's meeting on September 15, 2020, expressing that they prefer to fly on JSX. Defendants' conduct harmed the County's residents and the public.

## LEGAL BACKGROUND

113.   Congress has preempted the field of aviation and air carrier regulation. This means that, *inter alia*, counties are not permitted to self-regulate the air transportation industry.  Any effort to do so is invalid under the Supremacy Clause of the United States Constitution.

114.   Congress determined that preemption was necessary in order to, among other things:  encourage entry into the air transportation market by new carriers; strengthen small air carriers to ensure a more effective and competitive airline industry; ensure the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination; and to prevent unfair, deceptive, predatory, or anticompetitive practices in air transportation. *See* 49 U.S.C. § 40101.

115.   The DOT and FAA are responsible for implementing, enforcing, and overseeing Congress' duly enacted aviation laws.  The FAA regulates aviation safety and has done so by implementing federal regulations pertaining to every aspect of airport and aircraft operations.  The DOT regulates economic aspects of the aviation industry.  Together, the DOT and FAA have full authority to regulate the aviation industry.

116.   Congress has expressly preempted state and local governments from enacting or enforcing "a law, regulation, or other provision having the force and effect of law related to price, route, or service of an air carrier . . ."  49 U.S.C. § 41713(b)(1).

117.   In so doing, Congress expressly wanted to avoid a patchwork of state and local regulations from unduly burdening interstate commerce.  As a result, nearly all state and local laws, regulations, or other provisions having the force and effect of law that relate to the aviation industry are preempted and invalid.

118.   Congress allows for an extremely narrow exception to the otherwise wholesale preemption for local governments "carrying out [their] proprietary powers and rights" as airport sponsors.  *Id.* § 41713(b)(3).  If a local government seeks to regulate within this exception, its regulations must (i) conform with federal law and (ii) be otherwise reasonable, non-arbitrary, and non-discriminatory.  *Id*.

119.   Local governments are expressly prohibited from unilaterally

imposing regulations in this area absent FAA approval.  In determining whether a local regulation restricting access to a public airport meets the narrow exception, the FAA has stated that such regulations must balance both local and federal interests.  The determination whether local regulations meet these requirements is left to the sole province of the FAA.

120.   Local restrictions that violate federal law or federal policy are *per se* unreasonable and thus do not fit within the narrow "proprietary right" exception.

**Airport Noise and Capacity Act ("ANCA") Preemption**

121.   Congress' most authoritative expression of intent regarding the extent of federal preemption in the area of access at public airports is the Airport Noise and Capacity Act ("ANCA"), 49 U.S.C. § 47521, *et seq*.

122.   ANCA was adopted after Congress determined that previous federal statutes and regulations were insufficient to ensure a uniform federal aviation policy regarding noise and airport access restrictions.

123.   ANCA, and the FAA's regulatory scheme generally, classify aircraft into four "Stages" based on noise levels.  Stage 1 aircraft emit the most noise, and Stage 4 aircraft emit the least, with Stage 2 and Stage 3 aircraft in between.  JSX operates Stage 3 aircraft.

124.   Through ANCA, Congress explicitly sought to address the "uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system[.]" 49 U.S.C. § 47521(2).  Because Congress recognized that local airport sponsors may seek to control access to airports within their jurisdictions, Congress expressly found that access restrictions to public airports "must be carried out at the national level."  *Id*. § 47521(3)-(4).  This is express preemption in the field of access to public airports and aircraft noise.

125.   The FAA has promulgated extensive regulations, published at 14 C.F.R. § 161 ("Part 161"), which create a uniform process for airport sponsors to

seek permission to introduce access restrictions at airports.

126.   ANCA prohibits airport sponsors from imposing regulations that restrict a Stage 3 aircraft's ability to access a public airport unless the sponsor complies with Part 161 and the FAA grants permission.

127.   To date, no airport has successfully obtained permission from the FAA to impose an access restriction on Stage 3 aircraft via the Part 161 process or otherwise.

128.   Indeed, ANCA's requirements for enacting access restrictions for Stage 3 aircraft are remarkably stringent.  Proprietors must obtain, *inter alia*, (i) FAA approval for the restriction or (ii) the unanimous consent of *all* aircraft operators affected by the restriction.  49 U.S.C. § 47524(c)(1).

129.   Federal courts and the FAA have both interpreted § 47524 as a requirement that all public airports comply with Part 161 before any access restriction affecting a Stage 3 aircraft can be enforced.  *See* 14 C.F.R. §§ 161.101, 161.301(c).

130.   Defendants have not sought nor obtained FAA approval for the access restriction contained in the Restriction.

131.   Defendants have also failed to obtain unanimous consent of all operators (as evidenced by this lawsuit).

132.   Moreover, even assuming that Defendants attempted to meet Part 161's strictures, they would have had to demonstrate to the FAA, among other things, that the Restriction:  (i) is reasonable, non-arbitrary and non-discriminatory; (ii) does not create an unreasonable burden on interstate or foreign commerce; (iii) is consistent with maintaining the safe and efficient use of navigable airspace; (iv) does not conflict with a law or regulation of the United States; (v) has received adequate opportunity for public comment; and (vi) does not create an unreasonable burden on the national aviation system.  49 U.S.C. § 47524(c)(2).

133.   Every one of the showings required to gain FAA approval are absent in Defendants' decision to unilaterally impose an access restriction through the Restriction.

134.   Specifically, Defendants:  (i) intentionally drafted the Restriction to arbitrarily discriminate against JSX and prohibit JSX from accessing the Airport; (ii) drafted the Restriction to prevent JSX from providing routes and services at both JWA *and* each of the cities to which JSX departed from or flew to from JWA (e.g., Las Vegas) which unreasonably burdens interstate commerce; (iii) enacted the Restriction for reasons unrelated to maintaining the safe and efficient use of navigable airspace given that JSX has an impeccable safety record and no incidents or accidents at JWA or anywhere else; (iv) acted contrary to and in express conflict with ANCA, the Airline Deregulation Act (*see infra*), and the Equal Protection Clause of the Constitution; (v) entirely ignored the widespread public response to the Board's decision to ban JSX from operating at the Airport (e.g., 5,500 emails sent to the Board in opposition in a 48-hour time period related to the Board's approval of the Leases); and (vi) unreasonably burdened the national aviation system by creating an unlawful and preempted local regulation that prohibits JSX from operating at JWA.

135.   The proper avenue for establishing that a local regulation meets the requirements of ANCA is through the Part 161 process, not through the deliberations of local governmental bodies.  In other words, the County's deliberations are expressly insufficient to justify an access restriction—that is precisely what Congress was preventing by enacting ANCA.  49 U.S.C. § 47521(2).

136.   The County cannot circumvent ANCA's requirements or the FAA's processes to impose access restrictions on Stage 3 aircraft.  FAA procedures are mandatory and comprehensive, and local attempts to regulate access that are not enacted in compliance with Part 161 are federally preempted.

Exhibit 4

137.    On information and belief, Defendants have not successfully completed the Part 161 process and thus the Restriction is invalid and preempted by ANCA.

138.    In sum, Defendants violated ANCA (and its implementing regulations) by imposing the Restriction that forbids JSX from operating at JWA.

139.    Furthermore, Defendants' unlawful and unconstitutional adoption of the Restriction was intentional.  Defendants were fully aware that any access restriction imposed by the Restriction was subject to ANCA's processes and thus subject to preemption.

140.    For example, at the September 15, 2020, public meeting where the County adopted the Restriction, Orange County Counsel Leon Page advised the Board that "when the Board is deliberating over these leases there are two . . . provisions of federal law … that we are mindful of . . . [One] source of federal law is found in ANCA . . . and that generally [] limits the County from taking action to regulate noise."  Counsel Page went on to describe the process for adopting local regulations such as the one embodied in the Restriction as "a very strict, very stringent FAA approval process."[13]

141.    Defendants' adoption of the Restriction was also blatantly in favor of a more politically favorable group (e.g., large, traditional airlines who operate pursuant to Part 121), unreasonable, and discriminatory.  Among other things, by eliminating JSX from JWA, Defendants freed up additional customer capacity that can be reallocated to the major air carriers.  Defendants also protected the major air carriers, including (but not limited to) Southwest, Spirit, and Frontier, from competing with JSX's unique (and preferred) method of traveling to and from JWA on many of the same routes served by such major air carriers.

[13]    https://ocgov.granicus.com/player/clip/3785?view_id=8&redirect=true   (last accessed November 27, 2020).

142.   The Restriction is further unreasonable because it interferes with Congress' stated goals in enacting ANCA and begin the expressly disallowed process of localities creating a patchwork of regulations.

**Airline Deregulation Act ("ADA") Preemption**

143.   Under the ADA, 49 U.S.C. § 41713(b)(1), "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."

144.   A state or local law is "related to" a price, route or service if it has "[1] a connection with, or [2] reference to" a price, route, or service. *American Airlines v. Wolen*, 513 U.S. 219, 223 (1995); *Air Transport Ass'n of Am. v. City & Cty. Of San Francisco*, 266 F.3d 1064, 1070-71 (9th Cir. 2001).

145.   ADA "services" "refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided." *Air Transport Ass'n*, 266 F.3d at 1070-71.

146.   ADA "rates" and "routes" generally refer to the point-to-point transport of customers. "Rates" indicates price; "routes" refer to courses of travel. *Id*.

147.   The only exception to the ADA's broad and explicit preemptive effect is that the ADA "does not limit a State, political subdivision of a State, or political authority of at least 2 States that owns or operates an airport served by an air carrier holding a certificate issued by the Secretary of Transportation from carrying out its proprietary powers and rights." 49 U.S.C.A. § 41713(b)(3). This is known as the "proprietary right exception" and it is very narrowly interpreted.

148.   Under this narrow exception, a local government's exercise of its proprietary powers must be reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed not to conflict with the ADA and its policies.

149.   The validity of any local regulation therefore depends on (1) whether the regulation "is related to a price, route, or service of an air carrier"; (2) if so, whether regulation amounts to an exercise of its propriety powers; and (3) if it is an exercise of proprietary powers, whether such exercise is reasonable, nondiscriminatory, nonburdensome and not in conflict with the ADA.  If all these showings are met, the local regulation is exempted from preemption by 49 U.S.C. § 41713(b)(3).

150.   Here, the Restriction:  (1) prohibits JSX from providing certain routes (e.g., no city pairings with JWA are permitted, despite them being permissible under federal law) and certain services (e.g., customer service to and from JWA are eliminated); (2) is a flawed attempt by Defendants to exercise their proprietary powers (as any other explanation would not even arguably justify them); and (3) is unreasonable (they target a safe operator, JSX, for no reason), discriminatory (they single out JSX), and burdensome (they irreparably harm JSX, JSX's employees based at JWA, *and* the traveling public who prefer JSX's unique business model and socially distanced travel experience).

151.   Under the ADA, Defendants cannot lawfully impose or enforce the Restriction as it constitutes a regulation related to JSX's rates, routes, and services.

152.   Because the Restriction is arbitrary, discriminatory, and burdensome it is *per se* preempted under the ADA.

/ / /

/ / /

/ / /

/ / /

/ / /

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**The Restriction Is Preempted by Federal Law and Violates the Supremacy Clause of the U.S. Constitution – ANCA
(49 U.S.C. §§ 47521-47534)
(Against all Defendants)**

153.   Plaintiffs incorporate paragraphs 1 through 152 as though fully set forth herein.

154.   The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const., art. VI.

155.   Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

156.   Defendants' adoption of the Restriction is contrary to and interferes with federal law, including but not limited to ANCA.

157.   The adoption of the Restriction constitutes an access restriction for JSX's Stage 3 aircraft.

158.   Defendants did not comply with Part 161.

159.   All air carriers present at JWA did not unanimously consent to the new mandatory Restriction.

160.   The adoption of the Restriction is not an action which falls within the narrow proprietary right exception because, among other reasons, Defendants purposefully acted in violation of federal law by intentionally discriminating against JSX.

161.   The adoption of the Restriction was unreasonable, arbitrary, and discriminatory.

162.   The adoption of the Restriction was *per se* unreasonable and unlawful as Defendants took this action in violation of federal law.

163.   The adoption of the Restriction is preempted by federal law.

164.   The adoption of the Restriction violates the Supremacy Clause of the U.S. Constitution.

165.   Moreover, the Restriction constitutes an access restriction that did not exist prior to the passage of ANCA.  Indeed, Stage 3 on-demand carriers were able to operate out of JWA's FBOs prior to the enactment of ANCA (and in fact can still operate out of JWA's FBOs until January 1, 2021).

166.   The Restriction violates ANCA and JWA's Access Plan must be amended or eliminated as a result of this ANCA violation.

167.   As a result of Defendants' unconstitutional conduct, JSX seeks both preliminary and permanent injunctive relief prohibiting Defendants from enforcing the Restriction or otherwise banning JSX from operating at JWA as of January 1, 2021.

168.   JSX also seeks declaratory relief that makes clear that Defendants cannot prohibit JSX's operations through local law, regulation, or other provision having the force of law.

169.   JSX specifically seeks an injunction preventing Defendants from enforcing the Restriction and a declaration that the Restriction is invalid under ANCA.

170.   JSX also seeks a declaration that JWA's Access Plan is invalid and rendered nugatory due to the unlawful access restrictions set forth in the Restriction in violation of ANCA.

/ / /

/ / /

/ / /

## SECOND CAUSE OF ACTION

**The Restriction Is Preempted by Federal Law and Violates the Supremacy
Clause of the U.S. Constitution – ADA
(49 U.S.C. §§ 1371 *et seq.*)
(Against all Defendants)**

171.   Plaintiffs incorporate paragraphs 1 through 152 as though fully set forth herein.

172.    The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const., art. VI.

173.   Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

174.   Defendants' adoption of the Restriction is contrary to and interferes with federal law, including but not limited to the ADA.

175.   The adoption of the Restriction constitutes a regulation affecting the "rates, routes, and services" of JSX.

176.   The Restriction prevents JSX from flying certain routes (e.g., it prohibits any flight to or from JWA).

177.   The Restriction also prevents JSX from offering aeronautical services (e.g., it prohibits any customer services at JWA).

178.   The adoption of the Restriction is not an action which falls within the narrow proprietary right exception, as the adoption of the Restriction was unreasonable, arbitrary, and discriminatory.

179.   JSX has operated safely at JWA for years and has an impeccable safety record.

180.   JSX operates the quietest fleet of commercial aircraft at JWA.

181.   JSX was singled out by the Restriction as acknowledged by Mr.

Rondinella.

182.   Defendants' decision to target JSX is arbitrary and unconstitutional.

183.   The adoption of the Restriction was *per se* unreasonable and unlawful as Defendants took this action in violation of federal law.

184.   The adoption of the Restriction violates the Supremacy Clause of the U.S. Constitution and is thus preempted and invalid.

185.   Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, JSX irreparably by causing a substantial loss of business, damaging JSX's business reputation and goodwill, and putting JSX at a significant competitive disadvantage to other carriers operating at JWA.

186.   As a result of Defendants' unconstitutional conduct, JSX seeks both preliminary and permanent injunctive relief prohibiting Defendants from enforcing the Restriction or otherwise banning JSX from operating at JWA as of January 1, 2021.

187.   JSX also seeks declaratory relief that makes clear that Defendants cannot prohibit JSX's operations through local law, regulation, or other provision having the force of law.

188.   JSX specifically seeks an injunction preventing Defendants from enforcing the Restriction and a declaration that the Restriction is invalid under the ADA.

### THIRD CAUSE OF ACTION

**Deprivation of Equal Protection –
U.S. Const. Amend. XIV and 42 U.S.C. § 1983
(Against all Defendants)**

189.   Plaintiffs incorporate paragraphs 1 through 152 as though fully set forth herein.

190.   The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any

person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

191.   Defendant Mr. Rondinella is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.

192.   Defendant County is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.   The County has mandated and officially adopted a policy, ordinance, regulation and/or decision that violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

193.   Defendants' adoption of the Restriction singled out JSX for discriminatory treatment in violation of the Equal Protection Clause.   The Restriction does not prohibit the operations of any other on-demand carrier.  JSX is the only Part 135 operator prohibited from accessing the FBOs at JWA.

194.   Defendants have no legitimate justification or rational basis for instituting the new Restriction other than to discriminate against JSX and prohibit it from operating at JWA.

195.   Defendants intentionally treated JSX differently than any other operator at the Airport.

196.   The Restriction is not rationally related to any legitimate state interest. Rather, Defendants acted irrationally and arbitrarily with the sole intent of discriminating against JSX and preventing it from operating at JWA.

197.   Defendants intentionally discriminated against JSX, in whole or in part, for the illegitimate purpose of showing political favoritism to the larger Part 121 carriers utilizing JWA to the detriment of JSX.

198.  Defendants' adoption of the discriminatory Restriction, without any rational basis, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

199.  Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, JSX irreparably by causing a substantial loss of business, damaging JSX's business reputation and goodwill, and putting JSX at a significant competitive disadvantage to other carriers operating at JWA.

200.  JSX was irreparably harmed by Defendants' unconstitutional and discriminatory conduct because its constitutional rights have been infringed.

201.  As a result of Defendants' unconstitutional conduct, JSX seeks a declaratory judgment declaring that Defendants' new Restriction is unconstitutional, and that Defendants are not permitted to prohibit JSX from operating at JWA.

202.  As a result of Defendants' unconstitutional conduct, JSX seeks both preliminary and permanent injunctive relief prohibiting Defendants from enforcing the Restriction or otherwise banning JSX from operating at JSW as of January 1, 2021.

203.  JSX also seeks attorneys' fees as permitted by 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment:

A.  Declaring that the County must provide an accommodation to Plaintiffs that grants them access to the Airport on reasonable and non-discriminatory terms;

B.  Enjoining Defendants and any party in privity of contract with Defendants from imposing or enforcing the Restriction or otherwise imposing or enforcing any law, regulation, or other provision having

the force and effect of law which restricts JSX's access to JWA, or affects JSX's ability to offer federally authorized rates, routes, and services at JWA;

C.    Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

D.    Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

E.    Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims triable by a jury, pursuant to Federal Rules of Civil Procedure, Rule 38, and Central District of California Local Rules, Rule 38-1.

Dated: December 14, 2020      Respectfully submitted,

By:    */s/ William V. O'Connor*
        William V. O'Connor

BRIDGFORD, GLEASON & ARTINIAN
Richard K. Bridgford (CA SBN 119554)
Richard.Bridgford@Bridgfordlaw.com
Michael H. Artinian (CA SBN 203443)
Mike.Artinian@Bridgfordlaw.com
26 Corporate Plaza, Suite 250
Newport Beach, CA 92660
Telephone:  (949) 831-6611
Facsimile:  (949) 831-6622

COOLEY LLP
William V. O'Connor (CA SBN 216650)
woconnor@cooley.com
4401 Eastgate Mall
San Diego, California  92121-1909
Telephone:  (858) 550-6000
Facsimile:  (858) 550-6420

COOLEY LLP
J. Parker Erkmann (*Pro hac vice* to be filed)
perkmann@cooley.com
1299 Pennsylvania Avenue, NW, Ste. 700
Washington, DC 20004-2400
Telephone:  (202) 776-2036
Facsimile:  (202) 842-7899

Attorneys for Plaintiffs
Delux Public Charter, LLC d/b/a JSX Air and
JetSuiteX, Inc.