Exhibit 7



U.S. Department
of Transportation
**Federal Aviation
Administration**

Office of the Chief Counsel

800 Independence Ave., S.W.
Washington, D.C. 20591

December 1, 2020

Kathleen A. Yodice, Esq.
Yodice Associates
12505 Park Potomac Avenue
Sixth Floor
Potomac, MD  20854

      RE:    State of Florida Regulation of Air Traffic Patterns and Aviation Safety

Dear Ms. Yodice:

Thank you for your letter requesting a legal interpretation concerning a Florida state law regarding airport licensing requirements.  You advise that you represent an airport landing site owner who has applied for public airport site approval under Chapter 14-60 of the Florida Administrative Code, *Airport Licensing, Registration, and Airspace Protection Airport Site Approval*, and that the State's application of that law to your client raises preemption issues.

We understand that the land for the heliport (X44), an existing seaplane facility on Watson Island in Miami, is owned by the City of Miami, leased to your client, and that the City supports the establishment of the heliport.  You suggest that application of the Florida Administrative Code, Rule 14-60.005, *Airport Site Approval*, unlawfully regulates air traffic patterns and is thus preempted by Federal statutory and regulatory law.  You note that the Federal Aviation Administration (FAA) has issued a Notice of Airport Airspace Analysis Determination under 14 CFR part 157 finding no safety or airspace objection to the proposed heliport.

You state that the Florida Department of Transportation (FDOT) has refused to accept the FAA's safety determination as sufficient to meet the state's requirement that applicants demonstrate "that safe air traffic patterns can be established for the proposed airport with all existing and approved airport sites within three miles of the proposed airport site." Fla. Admin. Code R. 14-60.005(5)(j).

You advise that in discussions with FDOT concerning Rule 14-60.005(5)(j), that office asserted that a signed memorandum from each airport owner or operator is required in order to "deconflict" the airspace between the airport sites.  You argue that the State lacks the authority to regulate air traffic and mention that FDOT does not provide any enforcement mechanism or remedy should a nearby airport refuse to execute an agreement or should the State refuse to accept such an agreement.

You state that in accordance with the provisions of State law detailed above, to acquire a state license your client must obtain and submit to FDOT written and signed documentation from approximately 12 aircraft landing sites that are within three miles of your client's proposed airport site. Fla. Admin. Code R. 14-60.005(5)(j).  You indicate that most of these airports are uncontrolled and thus are only able to document the posted traffic patterns.  Otherwise, you state that the traffic

Exhibit 7

2

flow is governed by communication with FAA air traffic control or the general operating rules of 14 CFR part 91, with no ability for the airport to control the flight of aircraft.

As you note, FAA has already issued a part 157 Notice of Airport Airspace Analysis Determination – Alter Public Use Airport – No Objection (June 1, 2019), after conducting an aeronautical study.

In short, State and local laws that attempt to regulate aircraft traffic or operations, including the safety of airport traffic patterns; the weather conditions under which aircraft may operate; and aircraft takeoff direction for purposes of preventing mid-air collisions between aircraft, are preempted in accordance with the Federal statutory and regulatory framework.

Florida's Statutory and Regulatory Framework

Title XXV of the Florida Statutes Annotated, Chapter 330, § 330.30, *Approval of airport sites; registration and licensure of airports*, requires that the owner of any proposed airport shall, prior to site acquisition or construction or establishment of the proposed airport, obtain approval of the airport site from FDOT. Among other things, FDOT must be satisfied that "safe air-traffic patterns can be established for the proposed airport with all existing airports and approved airport sites in its vicinity." § 330.30(a)(4).

In accordance with § 330.30, Chapter 14-60 of the Florida Administrative Code, Rule 14-60.005 requires that any person proposing a new airport obtain an airport site approval order from FDOT prior to the establishment of an operational airport. Rule 14.60.005(4) states:

> (4) Conditions for Site Approval. [FDOT] shall grant site approval for a proposed airport that complies with all the requirements of Section 330.30, subject to any reasonable conditions necessary to protect the public health, safety, or welfare. Such conditions shall include operations limited to VFR flight conditions, restricted approach or takeoff direction from only one end of a runway, specified air-traffic pattern layouts to help prevent mid-air collision conflict with aircraft flying at another nearby airport, airport noise abatement procedures in order to satisfy community standards, or other environmental compatibility measures.
>
> Fla. Admin. Code R. 14-60.005(4).

Public airport site approval applications must include supporting documentation to allow FDOT to make its site approval determination and to ensure the applicant's satisfaction of conditions stated in Rule 14-60.005(4). For example, for proposed heliports, the application for site approval must include a list of "all VFR [visual flight rules] airports and heliports within three nautical miles and all IFR [instrument flight rules] airports within 10 nautical miles." Fla. Admin. Code R. 14-60.005(5)(e)(2). The section also requires submission of information concerning air traffic patterns as follows:

> (j) Air Traffic Pattern. Provide written confirmation, including a graphical depiction, demonstrating that safe air traffic patterns can be established for the proposed airport with all existing and approved airport sites within three miles of the proposed airport site. Provide a copy of written memorandum(s) of understanding or letter(s) of agreement, signed by each respective party, regarding air traffic pattern separation procedures between the parties

Exhibit 7

3

representing the proposed airport and any existing airport(s) or approved airport site(s) located within three miles of the proposed site.

Fla. Admin. Code R. 14-60.005(5)(j).

The Federal Statutory and Regulatory Framework

By statute, the FAA has authority to regulate for safety; the efficient use of the airspace; protection of people and property on the ground; air traffic control; navigational facilities; and the regulation of aircraft noise at its source. 49 U.S.C. §§ 40103, 44502, and 44701-44735. Congress has directed the FAA to "develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace." 49 U.S.C. § 40103(b)(1). Congress has further directed the FAA to "prescribe air traffic regulations on the flight of aircraft (including regulations on safe altitudes)" for navigating, protecting, and identifying aircraft; protecting individuals and property on the ground; using the navigable airspace efficiently; and preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects. 49 U.S.C. § 40103(b)(2). Since 1926, Federal law has provided that a citizen of the United States has a public right of transit through the navigable airspace. 49 U.S.C. § 40103(a)(2).

In furtherance of these statutory commands, the FAA has established a comprehensive regulatory scheme, governing, among other things, the certification of aircraft, airports, pilots and mechanics; aircraft equipage; air traffic control systems; aviation navigation and communication; airspace classifications, and more. See generally 14 CFR parts 21-193. Part 91, "General Operating and Flight Rules," sets forth extensive requirements concerning, among other things, aircraft operations and the regulation of airport traffic patterns. See, e.g., 14 CFR §§ 91.130(b); 93.119, 93.163, and 93.339(c) and (d).

Federal courts have upheld the Government's preemption of aircraft flight, including flight altitude and airport traffic patterns. See, generally, Burbank v. Lockheed Air Terminal Inc., 411 U.S. 624 (1973). "Common sense, of course, required that exclusive control of airspace allocation be concentrated at the national level, and communities were therefore preempted from attempting to regulate planes in flight." British Airways Board v. Port Authority of New York and New Jersey, 564 F.2d 1002, 1010 (2d Cir. 1977).

Under 14 CFR part 157, *Notice of Construction, Alteration, Activation, and Deactivation of Airports*, persons proposing to construct, alter, activate, or deactivate a civil airport (including heliports) or to alter the status or use of such an airport must provide notice to the FAA using Form 7480-1. The FAA then conducts an aeronautical study of an airport proposal and, after consultations with interested persons, issues a determination to the proponent ("no objection," "conditional," or "objectionable"). In its determination, the FAA considers matters such as the effects the proposed action would have on existing or contemplated traffic patterns of neighboring airports; the effects the proposed action would have on the existing airspace structure and projected programs of the FAA; and the effects that existing or proposed manmade objects (on file with the FAA) and natural objects within the affected area would have on the airport proposal. 14 CFR § 157.7(a). The purpose of an aeronautical study is to determine what effect the proposal may have on "… the safe and efficient utilization of the navigable airspace by aircraft, and the safety of persons and property on the ground." FAA Order JO 7400.2M, *Procedures for Handling Airspace Matters* (Jan. 28, 2019), ¶ 10-2-1(a). A complete study consists of "… an airspace analysis, a flight safety review, and a review of

the proposal's potential effect on air traffic control operations and air navigation facilities." ¶ 10-2-1(b).

While part 157 determinations consider the effects of the proposed action on the safe and efficient use of airspace by aircraft and the protection of persons and property on the ground, they "do[] not relieve the proponent of responsibility for compliance with any local law, ordinance or regulation, or state or other Federal regulation." 14 CFR § 157.7(a).

Analysis

The State's application of Rule 14-60.005 attempts to regulate the areas of aircraft safety, flight management, the protection of persons and property on the ground, and the efficiency of the navigable airspace. By conditioning approval of the proposed helicopter landing site on

> compli[ance] with all the requirements of Section 330.30, F.S., subject to any reasonable conditions necessary to protect the public health, safety, or welfare [such as] … operations limited to VFR flight conditions, restricted approach or takeoff direction from only one end of a runway, [and] specified air-traffic pattern layouts to help prevent mid-air collision conflict with aircraft flying at another nearby airport … (Rule 14-60.005(4)),

the Rule, through § 330.30, intrudes into an area fully occupied by the Federal Government, and therefore is preempted. 49 U.S.C. §§ 40103(a)(2), (b)(1) and (2); *Burbank*, 411 U.S. at 638-639; *Montalvo v. Spirit Airlines*, 508 F.3d 464, 473-474 (9th Cir. 2007) ("…federal law occupies the entire field of aviation safety. Congress' intent to displace state law is implicit in the pervasiveness of the federal regulations, the dominance of the federal interest in this area, and the legislative goal of establishing a single, uniform system of control over air safety."). The FAA's regulations in the areas of aviation safety and airspace efficiency are comprehensive. *See, e.g.*, 14 CFR §§ 91.130(b); 93.119, 93.163, and 93.339(c) and (d).

Under these principles, the State lacks the authority to regulate the safety of air traffic patterns, including whether traffic patterns between two nearby airports conflict; whether an airport can be used under instrument meteorological conditions; and runway operational usage. For example, in *Pirolo v. City of Clearwater*, 711 F.2d 1006, 1008 (11th Cir.1983), *reh'g denied*, 720 F.2d 688 (11th Cir. 1983), the court held that local ordinances prohibiting night operations and proscribing air traffic patterns were federally preempted and therefore violated the Supremacy Clause. U.S. Const. art. VI, cl. 2. In *Hoagland v. Town of Clear Lake*, 415 F.3d 693, 698 (7th Cir. 2005), a case involving the operation of a heliport on private property, the court noted, "[i]t would be unmanageable—say nothing of terrifying—to have local control of flight routes or of flight times. Such things require nationwide coordination." *See also Menard v. FAA*, 548 F.3d 353, 359–60 (5th Cir. 2008) ("[t]he FAA submits that … it has authority to establish non-standard traffic patterns, assign specific traffic pattern altitudes, or develop special operating procedures to mitigate potential airspace conflicts … We agree … Above all, adjusting air traffic patterns is part of the FAA's mandate. *See id*. § 40103(b)(1).").

Rule 14-60.005 requires that the applicant provide: (1) for proposed airport or seaplane landing facilities, a "list [of] all VFR airports and heliports within five nautical miles and all IFR airports within 20 nautical miles, or (2) for proposed heliports, a "list [of] all VFR airports and heliports within three nautical miles and all IFR airports within 10 nautical miles." Fla. Admin. Code R. 14-60.005(5)(e)(1)(2). The State also requires applicants to submit

Exhibit 7

5

written confirmation, including a graphical depiction, demonstrating that safe air traffic patterns can be established for the proposed airport with all existing and approved airport sites within three miles of the proposed airport site [and provide] a copy of written memorandum(s) of understanding or letter(s) of agreement, signed by each respective party, regarding air traffic pattern separation procedures between the parties representing the proposed airport and any existing airport(s) or approved airport site(s) located within three miles of the proposed site.

Fla. Admin. Code R. 14-60.005(5)(j).

Utilizing this air safety and airspace information to make determinations concerning the effects of the proposed landing facility or heliport on the safety of "all existing and approved airport sites" in the vicinity of the proposed site is beyond the scope of the State's authority.

Moreover, the State's assertion that its police power authority over "public health, safety, or welfare" would authorize it to determine whether to limit airport "operations … to VFR flight conditions, restricted approach or takeoff direction from only one end of a runway, [and] specified air-traffic pattern layouts to help prevent mid-air collision conflict with aircraft flying at another nearby airport" (Rule 14-60.005(4)) is without merit. State police power authority (including land use) does not permit regulation of aircraft safety, flight management, the protection of persons and property on the ground, or the efficiency of the navigable airspace. In *Burbank*, 411 U.S. at 638-639, the court held that Federal control over the management of airspace prevented the non-proprietor City of Burbank from exercising police power authority over aircraft operations. Noting that the "the Federal Aviation Act requires a delicate balance between safety and efficiency, and the protection of persons on the ground … The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled," the court reasoned that the "pervasive control" vested in the Federal Government "seems to us to leave no room for local curfews or other local controls." *See also San Diego Unified Port District. v. Gianturco*, 651 F.2d 1306 (9th Cir. 1981), *cert. denied*, 455 U.S. 1000 (1982) (non-proprietor, police power curfews on aircraft flights preempted). State and local governments may protect their citizens through land use controls and other police power measures not affecting aircraft operations.

If you have any questions, please do not hesitate to contact Jonathan Cross, Senior Attorney for Airport Certification, Regulations Division, at (202) 267-7173.

Sincerely,


Lorelei Peter
Assistant Chief Counsel for Regulations